22 December 1999

No.  2--98--1450 
 

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

JEAN C. LINDQUIST AND CHARLES   ) Appeal from the Circuit Court

LINDQUIST,                      ) of McHenry County.

                                )

Plaintiffs-Appellants,    )

                                )

v.                              ) No. 92--LA--116

                                )

CHICAGO AND NORTHWESTERN        )

TRANSPORTATION COMPANY,         )         

and UNION PACIFIC RAILROAD      )

COMPANY, successor in        )

interest to Chicago and         )

Northwestern Transportation     )

Company,              ) Honorable

                                ) Haskell M. Pitluck,

Defendant-Appellee.       ) Judge, Presiding.

JUSTICE GALASSO delivered the opinion of the court:

This case arises out of the March 21, l990, collision of an automobile driven by plaintiff Jean Lindquist (Jean) and a passenger train owned and operated by the Union Pacific Railroad, successor in interest to the Chicago and Northwestern Transportation Company (defendant), at the Oak Street crossing (crossing) near Crystal Lake.  On March 9, l998, plaintiffs, Jean and Charles Lindquist, filed a four-count amended complaint against defendant.  Count I sounded in negligence, alleging that defendant breached its duty to safely operate its trains and to properly maintain the automatic crossing warning devices at the subject crossing.  Count II alleged Charles’s loss of consortium due to defendant’s negligence.  Count III sounded in willful and wanton conduct, alleging that defendant was aware of faulty equipment at the crossing but failed to take reasonable steps to remedy the situation.  Count IV alleged Charles’s loss of consortium due to defendant’s willful and wanton conduct.  Subsequently, defendant filed a motion for summary judgment, arguing that there was no genuine issue of material fact and that it was entitled to judgment as a matter of law.  The motion for summary judgment also contended that application of the doctrines of 
res
 
judicata
 and collateral estoppel precluded plaintiffs from relitigating this case.  The motion was fully briefed and argued in the trial court.  On November 2, l998, the trial court granted the motion for summary judgment on the basis that no genuine issues of material fact existed and that defendant was entitled to summary judgment as a matter of law.  The trial court’s order did not address defendant’s 
res
 
judicata
 and collateral estoppel arguments.  This timely appeal followed.

On appeal plaintiffs raise the following arguments: (1) whether the evidence contains material questions of fact regarding defendant’s breach of its duties under Interstate Commerce Commission (ICC) regulations; (2) whether the frequent unnecessary activations of the automatic signals at a  railroad crossing create a hazardous condition that leads to injury; (3) whether evidence  of Jean’s and defendant’s breach of their respective duties creates a question of fact as to the relative degree of fault to be determined by the jury; and (4) whether defendant’s position should be rejected as a matter of law and as being contrary to the public policy of promoting safety at railroad crossings.

The record contains the following pertinent facts.  The crossing was located approximately one mile east of the Crystal Lake train station.  Oak Street ran in a north-south direction.  Two train tracks ran through the crossing in a northwest to southeast direction, with the result that motorists proceeding north on Oak Street would have to look somewhat "behind" themselves to see the tracks to the east of the crossing.  Also, to the east of the crossing was an area that included a number of sidetracks, where passenger trains were parked overnight and, during the day, where passenger trains performed "crossover maneuvers", 
i.e.
, were repositioned for return trips to Chicago.  The crossing was equipped with electronic traffic control devices, which automatically activated the crossing gates, flashing lights, and bell upon the approach of a train.  The record also indicates that a metal signal circuitry box (signal bungalow) was situated in the southeast quadrant of the crossing, approximately 18 feet to the south of the south edge of the mainline tie and 37 feet from the east edge of Oak Street.  The exact dimensions of the circuitry box do not appear in the instant record.

At approximately 8:55 a.m. on March 21, l990, Jean was driving her automobile in a northerly direction on Oak Street.  The weather conditions were dry and clear.  At the time of Jean’s approach to the crossing, a freight train, owned and operated by defendant, was stopped approximately 500 feet west of the crossing.  The freight train was waiting for a passenger train to complete a "crossover maneuver" on the tracks to the east of the crossing.  Both the freight train and the subject passenger train were operated by defendant.

Jean, who suffered serious brain injuries in the collision, was unable to testify to the events leading up to the accident.  In an affidavit that was attached to the motion for summary judgment, Frank Pellegrino made the following statements.  On the date and time in question, he was the driver of a passenger train that was traveling west from Chicago through Crystal Lake en route to Harvard, Illinois.  In his deposition, Pellegrino stated that his job title was that of a fireman.  However, he had extensive experience in driving trains.  Pellegrino further testified that the subject train was being operated with the locomotive first.  At the time of the accident, the locomotive’s dual headlights were on bright and a yellow revolving warning light on the locomotive’s roof was engaged.  In his affidavit, Pellegrino further stated that, as the subject train approached the crossing from the east, he observed the crossing’s signals were activated to warn of the train’s approach and that all of the vehicles first stopped at the crossing.  A short distance from the crossing, Pellegrino saw a northbound vehicle drive around the lowered gates and move into the train’s path.  Pellegrino stated that he immediately applied the emergency brakes and sounded the whistle to no avail.  According to Pellegrino, the speed limit for the subject section of track was 70 miles per hour and the train’s speed just before the collision was approximately 60 miles per hour.  In applying the emergency brakes and sounding the whistle, Pellegrino suffered an injury to his left shoulder, which was the subject of a lawsuit filed against Jean and defendant.  Defendant settled with Pellegrino in the amount of $8,538.41.  The case proceeded to trial in late 1995 and resulted in a $15,000 jury verdict for Pellegrino against Jean, which was set off by the amount of the settlement with defendant.

Two motorists, Elizabeth Dietrich and Mary Marin, were stopped behind the lowered gate on the north side of the crossing at the time of the collision.  In her deposition, Elizabeth Dietrich stated that she had observed the faulty operation of the subject crossing gates on a number of occasions and had even gone around the lowered gates several times, making certain to look both ways before doing so.  On the morning in question, as Dietrich was traveling south on Oak Street towards the crossing, she observed the crossing gates lower into the down position.  Dietrich explained that she was stopped behind another car on the north side of the crossing.  She first observed Jean’s car as it pulled up to the crossing’s south gate.  Dietrich estimated that the car was in a stopped position between 5 and 10 seconds before the driver began to maneuver it around the lowered gate.  According to Dietrich, the car stopped briefly before actually driving onto the tracks.  She did not observe that the driver was having any difficulty controlling her automobile.

Mary Marin gave two statements regarding her recollection of the collision.  In the first statement taken six days after the collision, Marin said she was traveling south on Oak Street and saw a stationary freight train approximately 500 feet to the west of the crossing.  As she approached the crossing, the gates came down, and she stopped in front of the gate.  Marin stated that she saw the subject automobile coming in the opposite direction.  She "assumed" that the car stopped momentarily at the gate.  Then it "quickly started up again and *** went around the gate and came up onto the tracks."  Marin heard a train whistle blow and then saw the train hit the car.  In her second statement, Marin said that approximately 30 to 45 seconds elapsed from the time the gates came down to the time of the collision.

In his deposition, Floyd Bryant, the engineer of the freight train that was stopped over 500 feet to the west of the crossing, testified that it appeared to him that the crossing’s gates were working properly on the morning of the collision.  Bryant also stated that, on approximately 25 occasions, he had been the engineer of a train that passed through the crossing.  He testified that he had never seen the crossing’s gates operate improperly. Bryant further stated that if, on the morning in question, the gates had stayed down after being activated by the approach of the freight train, he would have sent a trainman to the crossing "to raise the gates manually or flag the crossing to protect the crossing."

Bernard Morris testified that he was the chief railroad engineer for the Illinois Commerce Commission.  He stated that unnecessary activations relating to the unnecessary operation of crossing signals caused by train "crossover maneuvers" are covered by sections 1535.350 and 1535.365 of the ICC regulations.  Morris testified regarding the danger to the public caused by frequent unnecessary activation of crossing lights as follows:

"Q. What is the danger to the public with excess operation of warning devices?

A. *** [I]f it’s frequent enough-typically, when you have someone who runs a signal or gate, a common lament that you hear is 'Well, the gates are always down,' and either there’s no train there or the train was stopped near the crossing.

So *** if you have it [occurring] regularly, people get used to a situation where the train is stopped near the crossing, the gates are down.  They will sometimes then not even bother to look.  They just go around them.

Q. If people in a given area who frequently use a crossing where the gates activate and no train comes through, over time they will rely less on the gate; is that the danger? *** That they will view the gates as unreliable; is that the danger?

A. *** I think the danger is that they disregard the gates without looking.  They will go around them without looking.

Q. Because they are used to the gates coming down and no train coming through?

A. Well, or there being a train nearby, but stopped, or going away from the crossing."

Further, the record contains an article from the Signalman’s Journal, April 1990, entitled "Driver Behavior at Railroad Crossings: Is it Just Recklessness?", from which the following excerpt is taken.

"The problems facing drivers at grade crossings have also been analyzed by a number of human factors experts, including Dr. Herschel Leibowitz, Professor of Psychology at Penn State University and an internationally recognized authority on human vision and perception.  Dr. Leibowitz, testifying at the *** most recent Federal Railroad Administration hearing on grade crossing regulations, stated he was initially challenged by grade crossing accidents 'because theoretically there shouldn’t be any.'

In analyzing the causes of the thousands of accidents recorded each year, however, Dr. Leibowitz said the credibility of warning systems at crossings emerges as a critical factor in understanding the driver behavior problems associated with those accidents.  He said instances of improperly activated signals (false warnings) are similar to the classic tale of 'the boy who cried wolf.'

Dr. Leibowitz said such false warnings lead drivers to base their decision-making at railroad crossings more on their own perceptions instead of the information from warning devices.  He added, 'It turns out, very unfortunately, that there are a number of factors in the grade crossing environment which bias the decision in the wrong direction.'  He said studies show that drivers have a natural tendency to underestimate the speed and distance of trains approaching a crossing and 'think they have more time than is the case.'

Dr. Leibowitz said false warnings also have a significant and damaging effect on efforts to educate drivers and establish the credibility of crossing signals.  'One false positive can undo a lot of previous learning,' he said.  Dr. Leibowitz said false warnings at one crossing also have an effect on driver behavior at other crossings.  'The effect of false positives is not for just the given crossing, it’s for the whole system.  And it spreads across different grade crossings and across different people.' "

Also contained in the record are the depositions of numerous people who had experienced problems at the crossing.  There was significant testimony that the gates would often be activated when no train was in the area and that the gates would sometimes improperly stay down for long periods of time.  A number of people testified that, after the crossing gates had been down for a long time, they saw numerous cars drive around the gates.  A substantial portion of those testifying admitted that they too drove around the gates, after waiting a considerable amount of time for a train to pass through the crossing.  For example, Terry Ellis testified that he was the retired president and chairman of the board of the First National Bank in Crystal Lake.  He had crossed the subject crossing everyday while commuting to work.  Ellis estimated that, on a daily basis, he would cross the crossing four to six times a day.  He further testified that before the date of the subject accident, he observed "hundreds of cars" drive around the crossing’s lowered gates.  He estimated that at least twice a month he observed the gates down and the flashers working when no train was passing through the crossing.  Ellis stated that he complained about the situation to the Crystal Lake police department.  Ellis stated that he drove around the crossing gates every time the gates were down and no train was coming.  Ellis also testified that before the subject accident there were occasions when he was at the crossing and observed a train parked to the west of the crossing while the gates were down and their flashers were activated.  He had the impression that the gates and flashers were activated by the parked train.  Ellis further stated that after observing the false and unnecessary activations for so many years, he had lost faith in the gates as a credible warning system for the approach of a train.

Plaintiff Charles Lindquist stated that Jean and he lived within a few blocks of the crossing.  On many occasions before the accident, he and Jean were in the car together at the crossing, when they saw the signals function without a train being present. He testified that he drove around the down gates with Jean in the car many times. Charles had also observed numerous other motorists drive around the down gates before and after the accident.  Further, before the accident, Charles and Jean  had talked about the gates being down when no train passed through the crossing. Charles testified that they talked about the crossing situation at home, as well as in the car, and that excessive activations at the crossing were "very commonplace and so [we] discussed it from time to time."  Charles also stated that sometimes the crossing situation "was an abomination.  You couldn’t rely on anything."

Several people testified regarding whether the "signal bungalow" located southeast of the crossing blocked a northbound driver’s view of the tracks to the east.  One witness stated that the signal bungalow did not block the driver’s view eastward.  Another testified that the signal bungalow caused some problem in looking to the tracks to the east, while a third stated that the structure blocked the view to the east.  Additionally, there was expert testimony that excessive or unnecessary activation of automatic warning signals will cause the public to disregard the warning signals and not look for oncoming trains.

There was documentary evidence that in 1980, Crystal Lake officials had notified defendant of the continuing problems related to the crossing’s gates being improperly activated.  In 1982, in an attempt to improve the functioning of the crossing’s warning system, defendant installed grade crossing predictors in the crossing’s circuitry system.

We first address plaintiffs' contention that the record contains substantial evidence that defendant created and permitted to exist for a number of years a hazardous condition at the crossing that caused, in whole or in part, Jean’s injuries. Plaintiffs also maintain that where the evidence indicates that both plaintiff and defendant breached independent duties, it is the trier of fact’s province to determine the relative degrees of fault.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  
Missouri Pacific R.R. Co. v. American Re-Insurance Co.
, 286 Ill. App. 3d 129, 133 (1996).  Summary judgment is a drastic measure and should only be granted if the movant’s right to judgment is clear and free from doubt.  
Missouri Pacific
, 286 Ill. App. 3d at 133.  In appeals from rulings on summary judgment, the court conducts a 
de
 
novo
 review.  
Missouri Pacific
, 286 Ill. App. 3d at 133.  Further, a plaintiff may not recover for any alleged negligence on defendant’s part unless such negligence proximately caused the plaintiff’s injuries.  
Hamilton v. Atchison, Topeka & Santa Fe Ry. Co.
, 175 Ill. App. 3d 758, 760 (1988).

There is little dispute that Jean acted negligently in driving around the lowered crossing gates and onto the railroad tracks.  By doing so, Jean violated a statute designed for the protection of human life and property.  Ill. Rev. Stat. 1989, ch. 95½, par. 11--1201(b) (now 625 ILCS 5/11--1201(b) (West 1996)).  Such a violation is 
prima
 
facie
 evidence of negligence.  
Hamilton
, 175 Ill. App. 3d at 760.  However, a violation of this statute does not constitute negligence 
per
 
se
, as evidence of negligence can be rebutted by proof that the person acted reasonably under the circumstances.  
Hamilton
, 175 Ill. App. 3d at 760.  Typically, whether one acted reasonably is a question of fact to be decided by the trier of fact, but when the facts are undisputed and reasonable minds cannot disagree, the issue may be determined as a matter of law.  
Hamilton
, 175 Ill. App. 3d at 760.

Further, it is undisputed that the crossing gates were in the up position prior to the collision; that the crossing gates lowered to the down position during the approach of the passenger train; that the warning bell and the flashing lights on the gates were working; that the train’s dual headlights were on bright and the revolving yellow light on top of the locomotive was operating; that the train was traveling under the posted speed limit; that plaintiff was traveling northbound on Oak Street; that plaintiff stopped briefly at the crossing gate; that plaintiff then began to drive around the crossing gate in violation of the above cited statute and braked when she heard the train’s horn sound; that Frank Pellegrino did not see plaintiff’s car between the gates until the train was approximately 60 feet from the vehicle; that Pellegrino applied the emergency brakes and sounded the whistle as soon as he saw plaintiff’s car drive upon the tracks.  This evidence additionally indicates negligence on Jean’s part in causing the subject collision.

However, in these days of comparative negligence, that it is not the end of the inquiry.  A railroad has a duty to provide adequate warning devices at its crossings.  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 120 (1995).  The record on appeal shows that the false activation of the crossing’s warning system was an ongoing problem.  Defendant had long been aware of the false activations, and its efforts to solve the problem had not been successful.  Numerous residents of the area, who regularly used the crossing, testified regarding their experiences with false activations at the crossing.  For example, one person who used the crossing regularly estimated that the false activations occurred about one out of every four times that the crossing’s gates were lowered.  Many other people stated that they had seen numerous false activations of the crossing’s warning system.  Witnesses told of many drivers, often including themselves, going around the lowered gates.  Additionally, there was expert testimony and documentary evidence to the effect that ongoing false activations of crossing signals are dangerous as they cause the public to start disregarding the warning signals and to stop being alert for signs of oncoming trains.  This is sufficient evidence to bring the issue of defendant’s alleged breach of its duty to provide adequate warning signals before the trier of fact.

In conclusion, we concede that a trier of fact could find that Jean’s negligence clearly outweighed any negligence on defendant’s part.  However, we do not find that the facts here are sufficiently one-sided that the trial court could determine, as a matter of law, that Jean was the sole proximate cause of this accident.  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 118 (1995).  The fact that Jean’s negligence may have partially caused the accident does not prevent a finding that defendant failed to provide a safe warning system at the crossing and that such a failure constitutes a proximate cause of plaintiffs’ injuries.

Additionally, we observe that to uphold the trial court’s grant of defendant’s motion for summary judgment would, under these circumstances, run afoul of the public policy favoring safe railroad crossings.  As noted above, defendant had been on notice of the problems at the crossing for years.  Testimony indicated that it had failed to resolve those problems to any significant extent.  In this instance, to fail to return this cause of action for a determination by the trier of fact would in effect be sending a message to the railroads operating in this state that they had little or no duty to prevent false activations of warning signals of railroad crossings.  That is not, nor should it be, the law in Illinois.

Defendant’s primary reliance on 
Getman v. Indiana Harbor Belt R.R. Co.
, 172 Ill. App. 3d 297 (1988), and 
Hamilton v. Atchison, Topeka & Santa Fe Ry. Co.
, 175 Ill. App. 3d 758 (1988), is misplaced.  Both cases are factually distinguishable from the instant appeal.  In 
Hamilton
, there were no allegations of false activations of the subject crossing’s warning system as a basis of defendant’s negligence, nor was there any evidence of notice to defendant regarding any malfunctioning of the signals.

Further, 
Getman
 did involve some evidence of false activations of the subject warning system.  However, this evidence, which consisted of five affidavits of persons stating that the subject crossing’s warning system frequently activated when no train was present or approaching, was attached to plaintiff’s second motion to vacate the grant of summary judgment, entered almost 1½ years earlier.  The trial court refused to consider the affidavits.  Initially, the 
Getman
 court found that the plaintiff was dilatory in presenting the affidavits and that the trial court had not abused its discretion in refusing their admission.  Further, "[f]or clarification only," it addressed plaintiff’s argument that the affidavits evidenced the existence of a genuine issue of material fact.  
Getman
, 172 Ill. App. 3d at 301.  The 
Getman
 court stated that it was uncontested that the malfunctioning of the warning signals did not cause the subject collision.  It further found that no evidence was presented establishing that the defendant had acted or failed to act in a way "which obstructed plaintiff’s exercise of care for his own safety."  172 Ill. App. 3d at 302.  The court concluded that the admission of the affidavits would not have demonstrated the existence of a genuine issue of material fact.  In the instant appeal, there is far more evidence of continuing false activations at the subject crossing than was put forward in 
Getman
.  Additionally, there is evidence that this defendant was on notice of the ongoing problems at the crossing, while there is no evidence that the 
Getman
 defendant was aware of false activations of the subject warning signals.  Also, in the instant appeal, unlike 
Getman
, there is evidence put forward that false activations cause drivers to disregard warning signals, particularly in circumstances such as occurred here, where the presence of the stopped freight train to the west of the crossing added to the potential confusion for drivers.

We conclude that the trial court erred in finding there was no genuine issue of material fact regarding defendant’s alleged negligence in failing to prevent frequent false activations of the crossing’s warning system and in creating a circumstance where drivers eventually disregarded the warning signals.

We next address defendant’s argument that, under the doctrines of 
res
 
judicata
 and collateral estoppel, Jean’s fault in causing the accident cannot be relitigated.

Before addressing these contentions, we will review the facts which form the basis of defendant’s argument.  On March 16, l992, Frank Pellegrino, the driver of the train that collided with Jean’s automobile, filed suit in the circuit court of Cook County against defendant and Jean for injuries to his left shoulder, allegedly arising out of the collision.  The case, entitled 
 Pellegrino v. Chicago and Northwestern Transportation Company and Jean C. Lindquist, (
Pellegrino
), was filed in the circuit court of Cook County as No. 92--L--3322.  In his complaint, Pellegrino alleged that Jean was negligent in ignoring the crossing’s warning devices and for driving around the lowered gates with a train in close proximity and that her negligence was a proximate cause of his injuries.  The complaint further alleged that defendant was negligent by failing to provide a flagman to protect the crossing under the subject circumstances and that defendant’s negligence was a proximate cause of his injuries.

Defendant settled Pellegrino’s claim for $8,538.41, an amount that operated as a setoff to the jury verdict of $15,000 for Pellegrino in his claim against Jean.  Judgment for Pellegrino was entered on October 31, l995.  Defendant first raised the defenses of 
res
 
judicata
 and collateral estoppel on July 20, l998.

Regarding 
res
 
judicata
, defendant argues that Jean’s fault for the subject collision has already been established in the 
Pellegrino
 litigation.  Defendant further maintains that the fact it was not a party to the trial in Pellegrino’s action against Jean does not affect the application of 
res
 
judicata
 to the appeal at bar.  Defendant contends that Illinois case law demonstrates that 
res
 
judicata
 has particular applicability in suits involving masters and servants.  In response, plaintiffs argue 
inter
 
alia
 that when the 
Pellegrino
 case went to trial the jury was not faced with the question of deciding whether defendant was negligent and, if so, what percentage of the fault for Pellegrino’s injuries was attributable to defendant.  Plaintiffs further maintain that there is no identity of subject matter and parties between the 
Pellegrino
 case and the appeal at bar.

In 
Torcasso v. Standard Outdoor Sales, Inc.
, 157 Ill. 2d 484, 490-91 (1993)
, our supreme court wrote:

"Under the doctrine of 
res
 
judicata
, a final judgment rendered on the merits by a court of competent jurisdiction is conclusive as to the rights of the parties and their privies and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand, or cause of action. [Citation.]  Where there is identity of parties, subject matter, and cause of action, the doctrine of 
res
 
judicata
 extends not only to every matter that was actually determined in the prior suit but to every other matter that might have been raised and determined in it.  [Citation.]  A cause of action consists of a single group of facts giving the plaintiff a right to seek redress for a wrongful act or omission of the defendant.  [Citation.]  Although a single group of operative facts may give rise to the assertion of more than one kind of relief or more than one theory of recovery, assertions of different kinds or theories of relief arising out of a single group of operative facts constitute but a single cause of action.  [Citation.]  The test generally employed to determine the identity of causes of action for purposes of 
res
 
judicata
 is whether the evidence needed to sustain the second action would have sustained the first. [Citations.]  If the same facts are essential to maintain both proceedings or the same evidence is necessary to sustain the two, there is identity between the causes of action asserted, and 
res
 
judicata
 bars the latter one.  [Citation.]  Identity of the causes of action may be determined from the record as well as from the pleadings in both causes.  [Citation.]  The burden of establishing 
res
 
judicata
, or estoppel by judgment [citation], is upon the party invoking it, and to operate as such it must either appear upon the face of the record or be shown by extrinsic evidence that the precise question, or point, was raised in determining the former suit."

We find that there is neither identity of causes of action nor identity of parties in 
Pellegrino
 and the instant appeal.  As to identity of causes of action, the issue of defendant’s alleged negligence in failing to prevent continuous false activations of the crossing’s warning system, which is central to plaintiffs’ case in the appeal at bar, was never a part of the 
Pellegrino
 litigation.  The only negligence alleged by Pellegrino against defendant was the latter’s failure to post a flagman at the crossing at the time of the accident.  Further, the only issue before the 
Pellegrino
 jury was whether Jean’s alleged negligence in driving around the lowered gates was a proximate cause of Pellegrino’s injuries.  Any alleged negligence on defendant’s part was never decided by the 
Pellegrino
 jury.  Given this record, we cannot find that there was identity of causes of action in the subject cases.

Moreover, there is no identity of parties in the subject cases.  In his cause of action, Pellegrino was the plaintiff and an adverse party to defendant.  In the appeal at bar, Pellegrino was neither a party nor an adverse party to defendant, and, in fact, was one of defendant’s primary witnesses.

Defendant further contends that the doctrine of collateral estoppel also precludes plaintiffs from relitigating this case. Defendant argues that collateral estoppel applies to the instant appeal because Jean was a party to the 
Pellegrino
 litigation and the issue decided in that case, "the responsibility for the train/car collision," is identical to the issue presented in the appeal at bar.  Plaintiffs assert that the only issue decided in 
Pellegrino
 was not the same as those presented in the instant appeal.  They point out that the only issue decided by the 
Pellegrino
 jury was whether Jean’s negligence was a proximate cause of Pellegrino’s injuries and that the jury did not have to determine the extent to which defendant’s negligence caused his injuries.  Plaintiffs contend that a jury in the instant case could find both Jean and defendant negligent and could further find that Jean’s negligence contributed less to the occurrence than defendant’s.  Additionally, plaintiffs argue that Jean’s "insurance-appointed defense counsel" in the 
Pellegrino
 litigation had no incentive to litigate issues relating to defendant’s liability for Jean’s injuries.

In 
Talarico v. Dunlap
, 177 Ill. 2d 185, 191-92 (1997), our supreme court stated:

"The minimum threshold requirements for the application of collateral estoppel *** are: (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication.  A previous requirement of 'identical-parties-

mutuality' has been eliminated.  [Citation.]

For collateral estoppel to apply, a decision on the issue must have been necessary for the judgment in the first litigation, and the person to be bound must have actually litigated the issue in the first suit. [Citation.]  Even where the threshold elements of the doctrine are satisfied and an identical common issue is found to exist between a former and current lawsuit, collateral estoppel must not be applied to preclude parties from presenting their claims or defenses unless it is clear that no unfairness results to the party being estopped.  [Citations.]

In deciding whether the doctrine of collateral estoppel is applicable in a particular situation, a court must balance the need to limit litigation against the right of a fair adversary proceeding in which a party may fully present his case.  [Citation.]  In determining whether a party has had a full and fair opportunity to litigate an issue in a prior action, those elements which comprise the ' "practical realities of litigation" ' must be examined.  [Citation.]  In some circumstances the absence of an incentive to vigorously litigate in the former proceeding is relevant in the application of collateral estoppel.  [Citations.]  There must have been the incentive and opportunity to litigate, so that a failure to litigate the issue is in fact a concession on that issue.  [Citation.]

Incentive to litigate might be absent, for instance, where the amount at stake in the first litigation was insignificant ***."

As stated above, the issue determined 
in 
Pellegrino
 is not identical to the issues presented in the instant appeal. Specifically, defendant’s negligence in relation to Jean’s injuries has not been quantified by a trier of fact.  All that 
Pellegrino
 settled was Jean’s liability to Pellegrino for the latter’s injuries.  As noted above, the trial court in that case did not address defendant’s negligence.  Moreover, as plaintiffs point out, there was virtually no incentive for the "insurance-appointed defense counsel" to pursue an action against defendant within the context of the 
Pellegrino 
case.  In that circumstance, the failure to litigate defendant’s negligence cannot be viewed as a concession on that issue.  Accordingly, we do not find the doctrine of collateral estoppel to be applicable to the appeal before us.

For the reasons stated above, we reverse the judgment of the circuit court of McHenry County and remand this cause of action for further proceedings consistent with this opinion.

Reversed and remanded.

BOWMAN, P.J., and GEIGER, J., concur.