FIDEL VELARDE *et al.*, Plaintiffs-Appellees, v. ILLINOIS CENTRAL RAILROAD COMPANY, d/b/a Canadian National/Illinois Central R.R. Company, *et al.*, Defendants-Appellants.

First District (1st Division)    No. 1—02—1859

Opinion filed November 8, 2004.

Weston W. Marsh and Tonita M. Helton, both of Freeborn & Peters, and Clausen Miller P.C. (James T. Ferrini, Edward M. Kay, Paula M. Carstensen, and Paul V. Esposito, of counsel), for appellants.

Timothy J. Cavanaugh, of Lloyd & Cavanaugh, and Michael W. Rathsack, both of Chicago, for appellees Fidel Velarde and Francisca Velarde.

Terrence J. Lavin, of Lavin & Nisivaco, P.C., and David A. Novoselsky and Leslie J. Rosen, both of Novoselsky Law Offices, both of Chicago, for appellees Rafael Apulello and Northern Trust Company.

JUSTICE McBRIDE delivered the opinion of the court:

This appeal involves a collision between a freight train and an automobile which occurred just after noon on January 9, 2001, on Army Trail Road in Bloomingdale, Illinois. The owner and maintainer of the tracks, defendant Illinois Central Railroad Company, d/b/a Canadian National/Illinois Central Railroad Company (CNIC or railroad), knew that snow and road salt had caused the intersection's warning gates and lights to malfunction and was using a stop-and-flag procedure there until the signals were repaired. On this particular dry,

sunny Tuesday afternoon, however, a CNIC dispatcher mistakenly advised a northwestbound train's engineer that the signal problem had been fixed, and the train, consisting of three locomotives and 63 cars, proceeded through the intersection at 50 miles per hour. The passengers of the southbound automobile it struck, plaintiffs Fidel and Francisca Velarde, and the driver of the automobile, the Velardes' adult daughter, Lilia Apulello, sustained primarily internal and closed-head injuries when their 1998 Ford Explorer was broadsided and then rolled several times. The Velardes filed a negligence action against CNIC and the owner and operator of the train, defendant Chicago Central & Pacific Railroad Company (CC&P). Lilia filed a separate action against the same two defendants, which was consolidated with her parents' suit. As a result of her head injuries, however, Lilia was subsequently declared a disabled person, and her co-guardians, The Northern Trust Company and her husband, Rafael Apulello, became the plaintiffs to her claim (Lilia or the Apulellos). Rafael also added a claim of his own for loss of consortium. A jury awarded more than $54 million to the occupants of the Ford Explorer and apportioned 60% liability to CNIC, 35% to CC&P, and 5% to Lilia, resulting in a slight reduction of the monetary awards. The jury also awarded Rafael $3.5 million. The trial judge entered judgment on the awards and denied motions for judgment notwithstanding the verdict and a new trial. On appeal, CNIC and CC&P contend (1) the use of a day-in-the-life video about Lilia, (2) the slight allocation of negligence to Lilia, (3) the large awards, and (4) improper closing arguments warrant a new trial on the issues of liability and damages, or damages alone, or alternatively, remittitur by $38 million.

The focus of defendants' appeal is their contention they were "ambushed" by the Velardes and Apulellos on the first day of trial with a 22-minute day-in-the-life video about Lilia. Defendants state they were surprised by the video's existence, vehemently and repeatedly objected to its presentation to the jury, and then suffered a predictable "bloodbath" in excessive damages and badly misallocated fault when the video unfairly elicited sympathy for plaintiffs. Defendants contend the case must be retried without the video.

The facts pertinent to this issue are as follows. In March 2001, defendants issued Rule 213 interrogatories (177 Ill. 2d R. 213), which included a question as to whether any photographs, movies and/or videotapes had been taken of the accident scene or the vehicle or persons involved. In June 2001, Lilia answered this question, "None." Trial was scheduled for Monday, January 28, 2002. Fact and opinion discovery closed in mid-November 2001. The video was recorded on January 8 and 12, or on January 8 and 16, 2002—the earlier dates ap-

pear in the transcripts and briefs, and the latter are marked on the copy of the video used during the trial. The Apulellos' attorney finished editing the raw video footage on Friday, January 25, 2002.

On Monday, January 28, 2002, the Apulellos' attorney told defense counsel that he had the video and intended to use it at trial. The video was discussed for the first time on the record that day, during the presentation of numerous motions *in limine*. At that point, neither the judge nor defendants had viewed the recording, and the judge deferred ruling on its admissibility.

The video was next addressed immediately after jury selection, on Tuesday, January 29, 2002. The Apulellos' attorney again raised the subject, describing the film as "demonstrative" rather than substantive evidence of the nature and extent of Lilia's injuries and indicating the parties were still exchanging demonstrative exhibits. The defense attorney acknowledged the defense was still working on a diagram, but said he was objecting to plaintiffs' use of the video because it was "way past any discovery disclosure time" and contained "testimonial" audio and unnecessary scenes. The Apulellos' attorney then offered to use the video without the audio track, said he would take out scenes showing Lilia's sister and nephew cleaning the house, and suggested the attorneys could meet that evening to reach an agreement about what else to "take out." The trial judge said "Okay," and then proceeded to address other aspects of the trial. The attorneys met that evening. According to a sworn statement from the Apulellos' attorney, he edited scenes from the video immediately after the attorneys met, in "strict accordance" with defense counsel's requests, and this version of the video was used at trial. The record shows the Apulellos' attorney played a few minutes of the video without the audio track during his opening statements, without objection from defendants. There was also no objection when Lilia's sister and Rafael narrated portions of the silenced recording while they described Lilia's weekday and weekend activities.

However, at the end of the week, on Friday, February 1, 2002, defense counsel broached the topic with the judge, stating:

"[DEFENDANTS' COUNSEL]: [The Apulellos' attorney] and I met [Tuesday night] at my office. I said, Look, I'll withdraw my objection if A, you take the audio out, B, some other parts and the other thing I said is I want the outtakes, I wanted unedited tapes, that was my deal.

I haven't gotten them, and my indication here today is I'm not going to get those unedited tapes. If that's the case then I'm going to renew my objection."

The Apulellos' counsel responded that according to the supreme

court's opinion in *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 579 N.E.2d 873 (1991), the Apulellos' outtakes from the original footage were privileged attorney work product, but that he had been willing to give the defense the edited version of the film which the Apulellos had intended to use at trial and the scenes defense counsel edited from that version when the attorneys met to review the prepared exhibit. The defense attorney countered:

> [DEFENDANTS' COUNSEL]: Judge, *** I don't have it here because this issue just came up, [but] there is actually some [case law] that [indicates] *** I'm even entitled to be there at the time these [scenes] are filmed. This is essentially no matter how you cut it, whether there is voice on it or no voice on it, a day in the life is a testimonial presentation. I can't cross[-]examine the film.
>
> The only thing I can do is see what was pulled out. What was pulled out is in essence a way that I could cross[-]examine ***. *** I'm renewing my objection if I don't get those outtakes."

The Apulellos' attorney responded that *Cisarik* was case law directly on point and that it shielded the Apulellos' outtakes from discovery. He questioned whether he would be expected to bring in all the drafts of any other trial exhibit. The defense attorney admitted that he was unfamiliar with *Cisarik*, but stated, "I was withdrawing an objection *** to the video because they agreed, A, to take out the audio, B, because they agreed to take out pieces of it, and I said C, I want the outtakes." The trial judge reassured defense counsel that he would receive plaintiffs' outtakes if the defense was legally entitled to them. However, after the defense attorney reviewed *Cisarik* during a break in the proceedings, he stated:

> "[DEFENDANTS' COUNSEL]: Judge, for the record, I am not going to disagree with what [the Apulellos' counsel] said *Cisarik* says. It does.
>
> I just want to make clear on the record my objection because, on the record, I disagree with *Cisarik*. I think it is wrong.
>
> My objection is A, that in my view it should have been produced during discovery so I am renewing that objection.
>
> B, I believe the outtakes are not work product, and that's it."

Nevertheless, in their combined posttrial motion for a new trial and judgment notwithstanding the verdict, defendants argued in part that the video should have been barred because defendants were wrongfully denied plaintiffs' outtakes. The Apulellos responded that the version used at trial was in fact "defense-approved." They summarized the proceedings quoted above and tendered the affidavit referenced above in which plaintiffs' counsel described his interaction with the defense attorney. Defendants moved to strike the attorney's affidavit, arguing that it contradicted an on-the-record statement of facts, and the trial judge denied the motion without comment.

Defendants' first specific contention about the video is that it contained fact and opinion testimony and was therefore "substantive evidence" which should have been barred from the trial because it was not timely disclosed in response to defendants' Rule 213 interrogatories. 177 Ill. 2d Rs. 213(a), (d). Rule 213(i) imposes a continuing duty on a party to "seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party." 177 Ill. 2d R. 213(i). In addition to citing the various paragraphs of Rule 213 and a host of related cases, defendants cite *Wiker v. Pieprzyca-Berkes*, 314 Ill. App. 3d 421, 430, 732 N.E.2d 92, 99 (2000), and *Warrender v. Millsop*, 304 Ill. App. 3d 260, 264, 710 N.E.2d 512, 519 (1999), for the proposition that the video was untimely disclosed or improperly withheld evidence. The Apulellos respond that the video was properly admitted as demonstrative evidence, pursuant to *Cisarik*, 144 Ill. 2d 339, 579 N.E.2d 873. Additionally, defendants' concerns about the video were accommodated when their attorney previewed and edited out certain footage, and the audio track was silenced while trial witnesses, whose testimony was subject to objection and cross-examination, provided narration. The Velardes add that they did not make, introduce, or use the video and that defendants have cited no authority for the proposition that the Velardes had a duty to produce someone else's demonstrative evidence.

■ The admission of a film into evidence is within the sound discretion of the trial court (*Carney v. Smith*, 240 Ill. App. 3d 650, 656, 608 N.E.2d 379, 383 (1992)), and an abuse of discretion occurs only where no reasonable person would agree with the trial court's conclusion. *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 685 N.E.2d 871 (1997).

■ Defendants' assertion that the day-in-the-life video was substantive evidence is refuted by the opinion which the Apulellos repeatedly cited at trial and defendants now almost ignore, *Cisarik*, 144 Ill. 2d 339, 579 N.E.2d 873. That case involved a brain-damaged infant and allegations of medical negligence. *Cisarik*, 144 Ill. 2d at 341, 579 N.E.2d at 874. The pertinent details are disclosed by opinions issued by the appellate and supreme courts. *Cisarik v. Palos Community Hospital*, 193 Ill. App. 3d 41, 549 N.E.2d 840 (1989), *aff'd in part & rev'd in part*, 144 Ill. 2d 339, 579 N.E.2d 873 (1991). The plaintiff's attorney decided to make a film depicting a typical day for the infant, in order to give the jury a grasp of the full extent of her disabilities. *Cisarik*, 144 Ill. 2d at 341, 579 N.E.2d at 874. The defense persuaded the trial judge to issue a protective order permitting each party to have one lawyer present during the filming, a copy of the finished film as well as all edited-out and unused footage, and the right to depose any authenticating witnesses. *Cisarik*, 193 Ill. App. 3d

at 43-45, 549 N.E.2d at 841-42. The judge reasoned that a day-in-the-life film was like an evidence deposition, and therefore it was subject to similar treatment. *Cisarik*, 193 Ill. App. 3d at 45, 549 N.E.2d at 842. The plaintiff, however, did not want the defense present during filming and took an appeal.

The appellate court disagreed only slightly with the trial judge's approach and found that because the film's preparation itself was not evidence, the plaintiff's attorney could make the film without opposing counsel in attendance. *Cisarik*, 193 Ill. App. 3d at 45, 549 N.E.2d at 842. The appellate court modified the protective order accordingly. *Cisarik*, 193 Ill. App. 3d at 45, 549 N.E.2d at 842. Notably, it did not disturb and in fact it expressly reiterated the portions of the order requiring (a) that all the film, whether or not it was used in the plaintiff's final edited version, be preserved for the defendants' viewing and use at trial as their own evidence, and (b) that the plaintiff's authenticating witnesses be subject to deposition. *Cisarik*, 193 Ill. App. 3d at 45, 549 N.E.2d at 842.

On further appeal to the supreme court, however, the entire protective order was reversed. *Cisarik*, 144 Ill. 2d at 343, 579 N.E.2d at 875. The supreme court determined that when viewed in its "proper light," a day-in-the-life film is "merely a type of demonstrative evidence," comparable to a still photograph, a drawing, a model, or even a chart, that it "has no probative value in itself," and that it serves only as a "visual aid to the jury in comprehending the verbal testimony." *Cisarik*, 144 Ill. 2d at 341, 579 N.E.2d at 874. In addition, the "preparation of such evidence" is properly deemed "the work product of the lawyer who is directing and overseeing its preparation" (*Cisarik*, 144 Ill. 2d at 341, 579 N.E.2d at 874), and "opposing counsel has no right to intrude into the production of this demonstrative evidence" (*Cisarik*, 144 Ill. 2d at 342, 579 N.E.2d at 875). The supreme court was not swayed by the defendants' argument that day-in-the-life films are a "parade of horribles" which should be subject to more stringent discovery guidelines than other types of evidence. *Cisarik*, 144 Ill. 2d at 342, 579 N.E.2d at 874. Instead, the court found that the standard two-prong test for admissibility of evidence such as still photographs, when and if the plaintiff offered the film into evidence at trial, would adequately protect the defendants. *Cisarik*, 144 Ill. 2d at 342, 579 N.E.2d at 874. Under the first prong, a foundation would have to be laid that the film was an accurate portrayal of what it purportedly showed, and under the second prong, the film's probative value could not substantially outweigh the danger of unfair prejudice. *Cisarik*, 144 Ill. 2d at 342, 579 N.E.2d at 874.

*Cisarik* makes clear that day-in-the-life-films are considered

demonstrative evidence which helps jurors understand witness testimony, rather than additional substantive evidence. Furthermore, it appears defendants' "substantive evidence" arguments more or less repeat *Cisarik*'s dissent. For example, the dissent emphasized that pretrial discovery promotes fair, efficient, and expeditious proceedings leading to the truth, rather than "trial as a battle of wits" (*Cisarik*, 144 Ill. 2d at 345-46, 579 N.E.2d at 876 (Miller, J., dissenting, joined by Freeman, J.)), and defendants here remark that the objectives of pretrial discovery include "enhanc[ing] the truth-seeking process," and "stop[ping] last minute trickery." The dissent stated that comparing a day-in-the-life film to other types of demonstrative evidence, such as a chart or graph, "overlooks the special nature" and "powerful and distinctive nature" of a day-in-the-life film (*Cisarik*, 144 Ill. 2d at 346, 579 N.E.2d at 876 (Miller, J., dissenting, joined by Freeman, J.)), and defendants echo that a day-in-the-life video "is virtually unique in its probative impact," and "able to inform and promote a better understanding *** *as no other evidence can do*" (emphasis in original). Based on these principles about discovery and the power of film, the dissent expressed concern that the opinion was "eliminating [the] defendants' discovery rights on the ground that the proposed film must ultimately satisfy tests for admissibility at trial" (*Cisarik*, 144 Ill. 2d at 345, 579 N.E.2d at 876 (Miller, J., dissenting, joined by Freeman, J.)) and "revert[ing] to the kind of trial by ambush that can result when discovery rights are ignored" (*Cisarik*, 144 Ill. 2d at 346, 579 N.E.2d at 876 (Miller, J., dissenting, joined by Freeman, J.)). Similarly, defendants now contend they were "ambushed" by the video and "in the age of full disclosure, the proceedings below are hard to fathom." Defendants' arguments do not persuade us to contravene *Cisarik* and conclude that the Apulellos' video should have been treated as additional testimony or substantive evidence, because it is not within our authority to overrule the supreme court or modify its decisions. *Walton v. Norphlett*, 56 Ill. App. 3d 4, 5, 371 N.E.2d 978, 979 (1977); *Belden Manufacturing Co. v. Chicago Threaded Fastners, Inc.*, 84 Ill. App. 2d 336, 340, 228 N.E.2d 532, 534 (1967).

As for *Wiker*, it concerned a surveillance video that was never used at trial; therefore, it was only *dictum* when the court indicated a surveillance video must be disclosed before it can be used at a trial even for cross-examination. *Wiker*, 314 Ill. App. 3d at 430, 732 N.E.2d at 99. We also point out that the court gave no indication when such disclosure must occur. *Wiker*, 314 Ill. App. 3d at 430, 732 N.E.2d at 99. Therefore, *Wiker*'s value here is nominal, at best. In defendants' other case, *Warrender*, the court found that a discovery violation occurred when the defendant kept a surveillance video of the plaintiff for two

months before turning it over. *Warrender*, 304 Ill. App. 3d at 270, 710 N.E.2d at 519. However, nothing comparable occurred here. The Apulellos' video was disclosed and tendered at the first opportunity. Filming began about three weeks before trial and took about one week to complete. The raw footage was then reviewed and edited by the Apulellos' attorney during the week preceding trial, and was finalized on a Friday. The Apulellos' attorney disclosed and tendered the video on the following Monday, supplementing the prior interrogatory answer that there was no video of the accident victims. Defendants' additional contention that the video should have been barred outright because the Apulellos delayed in creating it and did not disclose it at least 60 days before trial pursuant to Supreme Court Rule 218(c)) (166 Ill. 2d R. 218(c)) is unpersuasive, given that the record suggests the court modified the discovery deadline. Defendants do not deny the Apulellos' assertion that depositions were being taken by both sides until a week before trial. Moreover, since the purpose of the video was to illustrate the evidence regarding Lilia's life at the time of trial, it would make little sense to record her activities months in advance.

Thus, we are not persuaded by defendants' arguments that a retrial is warranted because the day-in-the-life video was disclosed and tendered too late in the proceedings.

■ Defendants' second main contention about the video is that they were entitled to discover the plaintiffs' outtakes but the trial judge erroneously read *Cisarik* as an indication that outtakes are protected by the attorney work product privilege and plaintiffs' counsel reneged on an agreement to surrender them. Defendants argue *Cisarik*'s "true holding" does not support the judge's ruling and urge this court to consider that the *Cisarik* briefs filed in the supreme court and now appended to defendants' reply brief did not ask the court to conclude that outtakes are privileged. Defendants also argue the trial judge should have stricken the affidavit of the Apulellos' attorney in which he described his interaction with defense counsel, because the affidavit contradicted an on-the-record statement that there was an agreement to tender all the outtakes. Defendants contend that the prejudice which resulted from their inability to use the outtakes entitles them to a new trial without the film.

The Apulellos respond that defendants already conceded on the record that *Cisarik* shielded the Apulellos' outtakes from discovery, and, therefore, the argument is waived on appeal. Further, the concession was correct; the trial judge's application of the case was also correct; and this intermediate court of appeal has no authority to contradict a higher court's opinion. In a motion ordered taken with the case, the Apulellos contend the *Cisarik* briefs are not properly

before this court and should be stricken from defendants' reply brief. As for the accuracy of their attorney's affidavit regarding the extent of his agreement with defense counsel, according to the Apulellos, the record discloses they consistently refused to produce their own outtakes based on *Cisarik* and its indications about outtakes and the attorney work product doctrine. The Velardes add the record shows they were not involved in the dispute about the outtakes.

We find defendants waived any contention they were prejudiced by their lack of access to the Apulellos' outtakes, because defendants failed to object when the edited video was first shown to the jury during the Apulellos' opening statements and when it was used to illustrate witness testimony. *Chubb/Home Insurance Cos. v. Outboard Marine Corp.*, 238 Ill. App. 3d 558, 573, 606 N.E.2d 423, 573 (1992) (failure to timely object waives question for purposes of review).

An additional reason for finding waiver is that defendants conceded on the record on February 1, 2002, that they were not entitled to the Apulellos' outtakes, based on *Cisarik* and the attorney work product doctrine. The transcript quoted earlier indicates defense counsel "disagree[d] with *Cisarik*" and thought the supreme court's determination was "wrong," but that he conceded the decision supported the Apulellos' position.

Furthermore, the concession about access to the outtakes was correct, because *Cisarik* plainly states that "opposing counsel has no right to intrude into the production of [a day-in-the-life film]." *Cisarik*, 144 Ill. 2d at 342, 579 N.E.2d at 875. We disagree with defendants' new assertion that this means only that opposing counsel has no right to attend filming. If this were the case, the supreme court would have left intact some portion of the protective order it contemplated, instead of "revers[ing] both the trial court and the appellate court as to the appropriateness of the protective order." *Cisarik*, 144 Ill. 2d at 343, 579 N.E.2d at 875. As already summarized above, the protective order entered by the trial court in *Cisarik* provided for the defense to be present when plaintiff filmed the infant and for the defense to receive a copy of every single frame recorded (*Cisarik*, 144 Ill. 2d at 341, 579 N.E.2d at 874), and the appellate court reversed the requirement that defense counsel be present during filming but reiterated that the defendants were "entitled to view all of the film taken" and "may use any film taken and not used by the plaintiff." *Cisarik*, 193 Ill. App. 3d at 45, 549 N.E.2d at 842. However, none of these provisions survived the supreme court's reversal. *Cisarik*, 144 Ill. 2d at 343, 144 Ill. 2d at 875. We also point out that the dissent—in a paragraph which defendants have chosen not to echo here—expressed concern that *Cisarik*'s plaintiff was challenging only whether the defense had a

right to be present during filming, yet the court was reversing *all* the lower courts' discovery guidelines (including the requirement that the defense receive footage edited-out and unused by the plaintiff's counsel). *Cisarik*, 144 Ill. 2d at 345, 579 N.E.2d at 875 (Miller, J., dissenting, joined by Freeman, J.). Because of the dissent, there is no question that *Cisarik* intentionally excluded the plaintiff's outtakes from discovery by the defense. Accordingly, we have no reason to contemplate the *Cisarik* briefs attached to defendants' reply brief and will not consider the Apulellos' motion to strike the attachment as improper.

■ We are also unpersuaded that the trial judge erred by denying, without comment, defendants' motion to strike the sworn statement of the Apulellos' attorney regarding his meeting with defense counsel about use of the video at trial. See *Hartgraves v. Don Cartage Co.*, 63 Ill. 2d 425, 428, 348 N.E.2d 457, 459 (1976) (an affidavit is insufficient to amend or correct the record). The transcripts, including irrelevant portions not summarized above, do not support defendants' assertion that the Apulellos' attorney expressly acknowledged in open court that he had agreed to relinquish his own outtakes or implicitly acknowledged an agreement to that effect by failing to contradict defense counsel's on-the-record statements. The transcript of February 1, 2002, in particular indicates that the Apulellos' counsel (a) immediately countered the assertion that defendants were entitled to the original, unedited footage, and (b) even referenced specific legal authority, *Cisarik*, 144 Ill. 2d 339, 579 N.E.2d 873, in support of his position that plaintiffs' outtakes were privileged under the attorney work product doctrine. Furthermore, the proceedings suggest that defense counsel initially believed he was legally entitled to plaintiffs' outtakes and, thus, no agreement to that effect was necessary. At first he characterized the film as a "testimonial presentation," contradicting *Cisarik*'s clear indication that a day-in-the-life film is merely "demonstrative evidence." *Cisarik*, 144 Ill. 2d at 341, 579 N.E.2d at 874. He also stated that he was entitled by law to be present during filming, demonstrating his lack of familiarity with *Cisarik*'s facts. Then he admitted, after he supposedly negotiated release of plaintiffs' outtakes, that he was unfamiliar with *Cisarik*, which is a case directly on point. Accordingly, after reviewing *Cisarik* during a break in the proceedings, he conceded that he was mistaken about a defendant's right to a plaintiff's unused footage. The fact that only the Apulellos' counsel was familiar with pertinent case law when the attorneys met about the contents of the video makes it improbable that the supposed agreement to relinquish the Apulellos' outtakes ever occurred. In addition, it is arguable that the February 1, 2002, transcript includes a

concession that the defense merely asked for the outtakes. The defense attorney "clarif[ied]" two things during the proceedings. First, that he had withdrawn his objection to the Apulellos' use of the video because the Apulellos' counsel agreed to "take out" the audio and certain scenes. Second, that he had *stated*, "I want the outtakes." For all these reasons, we reject defendants' assertion that the trial judge should have stricken the affidavit as an improper amendment or correction of the transcripts.

■ Defendants' next major contention about the video is that any probative value of the video was outweighed by the danger of prejudice to defendants. The Apulellos respond that the video cannot be characterized as unfairly prejudicial when it was approved by defense counsel, raised no objection, and is actually bland and innocuous. The Velardes suggest that any further response from them would be superfluous.

We have watched the exhibit at issue. It shows Lilia engaging in ordinary activities, including waking up, eating meals with her family, taking oral medication, dressing, brushing her hair, stripping linens from her bed, loading the clothes washer and dryer, putting on an overcoat, getting into the passenger's seat of a sport utility vehicle, and visiting her mother's house and a grocery market. We note that in many scenes, a family member prompts Lilia or helps Lilia in some other way to complete the activity, such as when she is encouraged to take the oral medication or do the laundry. Noteworthy exceptions to this pattern are at her mother's house, where Lilia rearranges the pillows on the living room sofa so that she can nap, and at the market where she strays away while her sister fills the shopping cart. Throughout the film, Lilia appears anxious and easily confused and she is frequently tearful. In our opinion, however, the film does not dwell on her discomfort. Additionally, the film seems to illustrate the impact of head trauma and possibly resulting medication on Lilia's life, consistent with witness testimony indicating, as examples, that Lilia took medication prescribed by her neurologist, had difficulty sustaining attention, needed someone to "cue her in" and give reminders, could not think flexibly or find solutions to problems, could not manage utensils, and was frustrated, fearful, anxious and extremely depressed. Testimony to that effect would have been given even if the illustrating video was never presented to the jury. Furthermore, the testimony regarding Lilia's life after the collision was not closely balanced and we cannot conclude that the video tipped the verdict in plaintiffs' favor. In addition, although defendants contend that some of the scenes were irrelevant and that the probative value of other scenes was destroyed because they were cut short, these contentions

are unpersuasive, given that the video was edited to the satisfaction of defense counsel before it was used during opening statements. We also reject defendants' unsubstantiated suggestion that the video may have included exaggerated and self-serving behaviors. Defendants do not cite any portion of the record indicating they objected to use of the video on this basis at trial; thus, they cannot now complain of error. *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327, 336, 399 N.E.2d 1322, 1326 (1980). Furthermore, defendants chose not to have their own medical expert examine Lilia and never called upon Lilia to testify, giving up opportunities to discredit the staged evidence, if in fact, it was staged. Defendants now protest that calling Lilia herself would have made defendants "look cruel and heartless," actually lending credibility to a video in which Lilia appears to this court to be confused and easily upset. In addition, the silenced video was narrated by trial witnesses whose testimony was subject to additional objection, cross-examination, and curative instruction, if warranted, and defendants are not arguing that the trial judge improperly rejected defendants' attempts to limit the impact of the video through these means. We conclude it is most improbable that the jury was unduly influenced by a film which shows Lilia engaging in commonplace activities in a manner that conformed with trial testimony about her injuries and disabilities. It was not an abuse of discretion to allow the jury to see the video.

In summary, we are not persuaded by any of defendants' arguments regarding the Apulellos' use of the day-in-the-life video at trial.

■ Defendants' fourth main contention on appeal concerns the jury's allocation of negligence, 60%, 35%, and 5% to CNIC, CC&P, and Lilia, respectively. Defendants argue none of the responsibility should have been assigned to CC&P, since it operated the train with "due care," and that at least half of the responsibility should have been attributed to Lilia. In a negligence action, the plaintiff must establish that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries proximately caused by the breach. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114, 649 N.E.2d 1323, 1326 (1995). The existence of a duty is a question of law for the court to decide, while the issues of breach and proximate cause are factual matters for the jury to decide, provided there is a genuine issue of material fact regarding those issues. *Espinoza*, 165 Ill. 2d at 114, 649 N.E.2d at 1326. Defendants assert that if fault is properly reallocated, Lilia will be statutorily barred from recovering damages from either defendant because her own contributory fault was more than 50% of the proximate cause of her injuries (see 735 ILCS 5/2—1116 (West 1994)), or at least CC&P will be ap-

portioned less than 25% of the liability and therefore rendered only severally liable for Lilia's nonmedical damages (see 735 ILCS 5/2—1117 (West 1994)). The Apulellos and the Velardes respond that the evidence supported the jury's verdict and allocation of fault.

The defendants unsuccessfully presented their allocation-of-negligence arguments to the trial judge in a single motion seeking judgment notwithstanding the verdict for CC&P or a new trial for defendants. CC&P's motion for judgment notwithstanding the verdict (judgment *n.o.v.*) should have been granted if all the evidence, viewed mostly favorably to Lilia, so overwhelmingly favored CC&P that no contrary verdict based on that evidence could ever stand. *Maple v. Gustafson*, 151 Ill. 2d 445, 453, 603 N.E.2d 508, 512 (1992). "This is clearly a very difficult standard to meet, limiting the power of the circuit court to reverse a jury verdict to extreme situations only." *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714, 631 N.E.2d 266, 269 (1994) (*Smith*). "Unquestionably, it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony." *Maple*, 151 Ill. 2d at 452, 603 N.E.2d at 511-12. "A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable." *Maple*, 151 Ill. 2d at 452, 603 N.E.2d at 512. "The court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512. This court reviews *de novo* a trial judge's decision to grant or deny a motion for judgment *n.o.v.*, but like the trial judge, must be careful not to usurp the function of the jury and substitute its own assessment. *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125, 738 N.E.2d 542, 547 (2000).

On the other hand, when presented with CC&P and CNIC's motion for a new trial, the trial judge was expected to weigh the evidence. *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512. However, a new trial should not be granted merely because some evidence is conflicting. *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969, 973 (1990). Rather, the trial judge should set aside the jury's verdict if it was contrary to the manifest weight of the evidence, which occurs " 'where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.' " *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512-13,

quoting *Villa*, 202 Ill. App. 3d at 1089, 560 N.E.2d at 973. This type of motion is reviewed for an abuse of discretion (*Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513), as is a motion seeking reallocation of fault (*Usselmann v. Jansen*, 257 Ill. App. 3d 978, 982, 629 N.E.2d 193, 196 (1994)). A reviewing court should be mindful that when ruling on a motion for a new trial, the trial judge " ' "has the benefit of [previously observing] the appearance of the witnesses, their manner in testifying, and the circumstances aiding in the determination of credibility." ' " *Maple*, 151 Ill. 2d at 456, 603 N.E.2d at 513, quoting *Buer v. Hamilton*, 48 Ill. App. 2d 171, 173-74, 199 N.E.2d 256, 257 (1964), quoting *Hulke v. International Manufacturing Co.*, 14 Ill. App. 2d 5, 47 (1957).

Defendants now summarize only certain evidence and related legal principles. This is not an effective means of establishing that all the evidence, viewed most favorably to Lilia, overwhelmingly favored CC&P, or that the manifest weight of the evidence favored CC&P and CNIC. For example, CC&P contends the evidence shows CC&P acted reasonably and that Lilia did not prove that CC&P negligently failed to keep an adequate lookout and negligently failed to decrease speed when the train crew saw vehicles continue to go over the track crossing. CC&P asserts the evidence showed the train's engineer, Dallas Harken, and conductor, John Snapp, were looking ahead for vehicles, while traveling at a lawful rate of speed. Further, engineer Harken saw vehicles continuing to cross when the train was still "a pretty far distance away," and conductor Snapp saw them when the train was about 600 feet from the crossing and stated it was not uncommon for cars to cross when a train was approaching. CC&P cites *Robertson v. New York Central R.R. Co.*, 388 Ill. 580, 585, 58 N.E.2d 527, 529 (1944), and *Brennan v. Wisconsin Central, Ltd.*, 227 Ill. App. 3d 1070, 1084, 591 N.E.2d 494, 504 (1992), for the proposition that under these circumstances Lilia was under a duty to stop and that CC&P was under no duty to stop. Further, Harken saw another vehicle cross when the train was within 100 feet of the crossing, and then another, which was "not unusual" to see. A witness placed Lilia in the next lane and immediately behind this car. Snapp did not have sufficient time prior to the collision with Lilia to order Harken to stop, and Harken applied the emergency brake on impact. We conclude, however, that although this evidence indicates the train crew was looking for vehicles and decreased speed at impact, it does not indicate that it was necessarily reasonable for the train to continue at full speed to this particular intersection. Furthermore, the *Robertson* case that defendants rely upon indicates that a train stop is required when it is apparent that a motorist has not heard or will not heed a train's

signal (*Robertson*, 388 Ill. at 584, 58 N.E.2d at 529; see also *Espinoza*, 165 Ill. 2d at 115, 649 N.E.2d at 1327), yet defendants fail to address Snapp's admission that when he observed cars going over the crossing when the train was still 600 feet away, even he thought there might be something wrong ahead and that either he or Harken questioned, "Are those cars going to stop or not[?]" Defendants contend Lilia was under a duty to stop, but they fail to address the admitted fact that the intersection's warning gates and lights were not functioning properly. There was also evidence suggesting that the approaching train was all but invisible to Lilia because the tracks bisected Army Trail Road at such an angle that she could not have seen the rapidly approaching train unless she severely turned her head to the left, and that even if she had turned, her view would have been obstructed by bordering trees and bushes. Although defendants contend Lilia was under a heightened duty to proceed cautiously because her view was obstructed (see *Duffy v. Cortesi*, 2 Ill. 2d 511, 518, 119 N.E.2d 241 (1954)), evidence of negligence can be rebutted by proof that the person acted reasonably under the circumstances. *Lindquist v. Chicago & Northwestern Transportation Co.*, 309 Ill. App. 3d 275, 283, 772 N.E.2d 270, 276 (1999). In addition, whether a person acted reasonably under the circumstances is a question of fact, unless the facts are undisputed and reasonable minds could not disagree. *Lindquist*, 309 Ill. App. 3d at 283, 722 N.E.2d at 276.

Defendants engage in a similarly incomplete and ineffective analysis of some of the evidence presented to the jury in support of plaintiffs' allegations that CC&P failed to obey an applicable operating rule and failed to sufficiently sound the train's horn.

When considering all the evidence in a light most favorable to Lilia, we cannot say that it so overwhelmingly favored judgment for CC&P on plaintiffs' claims that the verdict against the train operator cannot stand. Nor can we say that the negligence verdict or the 60%, 35%, and 5% apportionment of fault amongst the various parties involved in the collision was against the manifest weight of the evidence. The record does not indicate that the opposite conclusions were clearly evident or that the jury's findings were unreasonable, arbitrary, or not based on any of the evidence. The jury's verdict was supported by the evidence and there was no apparent basis for the trial court to disturb it. Accordingly, the trial court's ruling as to CC&P's motion for judgment *n.o.v.* and defendants' motion for a new trial is affirmed.

■ We next address defendants' fifth main contention on appeal: the jury's noneconomic damage awards were excessive as a matter of law and should be subjected to a new trial or remitted. According to

defendants, Fidel's $15.5 million award for pain and suffering and disability should be reduced by $11.5 million, and his wife Francisca's $5.5 million award for pain and suffering and disability should be reduced by $4 million. Also, Lilia's $28 million award for pain and suffering and disability should be reduced by $21 million, and her husband Rafael's $3.5 million award for loss of consortium should be reduced by $1.5 million. The Apulellos and Velardes respond that the damage awards were fair and reasonable in light of the permanent and catastrophic injuries that occurred.

The amount of a verdict is generally at the discretion of the jury. *Dahan v. UHS of Bethesda, Inc.*, 295 Ill. App. 3d 770, 692 N.E.2d 1303 (1998). A damage award is not subject to scientific computation. *Schaffner v. Chicago & North Western Transportation Co.*, 161 Ill. App. 3d 742, 759, 515 N.E.2d 298, 308 (1987). A question of damages is to be determined by the trier of fact, and "a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." *Richardson v. Chapman*, 175 Ill. 2d 98, 113, 676 N.E.2d 621, 628 (1997); *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069, 734 N.E.2d 916 (2000). However, a court will order a remittitur, or, if the plaintiff does not consent, a new trial, if a verdict is excessive. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 412-13, 689 N.E.2d 1057, 1079-80 (1997). In *Richardson*, the supreme court indicated that an award may be viewed as excessive if it (1) exceeds the range of fair and reasonable compensation, (2) is the result of passion or prejudice, or (3) is so large that it shocks the judicial conscience. *Richardson*, 175 Ill. 2d at 113, 676 N.E.2d at 628. But remittitur will not be ordered when an award " 'falls within the flexible range of conclusions which can reasonably be supported by the facts.' " *Best*, 179 Ill. 2d at 412, 689 N.E.2d at 1079, quoting *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470, 605 N.E.2d 493, 510 (1992). The opinion also indicates that when reviewing an award of compensatory damages for nonfatal injuries, a court may consider, among other things, "the permanency of the plaintiff's condition, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries." *Richardson*, 175 Ill. 2d at 114, 676 N.E.2d at 628.

Defendants assert that the verdicts meet not just one but all three of the standards for construing the verdicts as "way out of line."

Defendants cite *Richardson*, 175 Ill. 2d at 113, 676 N.E.2d at 628, in particular, for the proposition that the jury's awards "fall[ ] outside the range of fair and reasonable" compensation. They argue an appropriate range may be determined by reviewing (a) reports of approximately 65 jury verdicts rendered in Cook County, and (b)

published opinions from Illinois and other states, such as Louisiana, New York, and Texas, which supposedly involve injuries "similar to those suffered here." Defendants' reliance on *Richardson*, however, is not well placed. Although *Richardson* stated that an award may be deemed excessive if it falls outside a fair and reasonable range (*Richardson*, 175 Ill. 2d at 113, 676 N.E.2d at 628), the court actually refused to engage in a comparison for a plaintiff who "suffered devastating, disabling injuries" in a two-car collision and indicated that Illinois courts have traditionally declined to make comparisons when determining whether a particular award is excessive. *Richardson*, 175 Ill. 2d at 114, 676 N.E.2d at 628, citing *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1065, 645 N.E.2d 284 (1994); *Northern Trust Co. v. County of Cook*, 135 Ill. App. 3d 329, 481 N.E.2d 957 (1985). See also *Carlson v. Dorsey Trailers, Inc.*, 50 Ill. App. 3d 748, 365 N.E.2d 1065 (1977) (indicating that reference to other awards is of doubtful relevance); *Lawson v. Belt Ry. Co. of Chicago*, 34 Ill. App. 3d 7, 27-28, 339 N.E.2d 381, 398 (1975) ("One wrongfully injured by another should be permitted to secure a recovery based upon the evidence of his own particular loss, rather than by consultation of a schedule of previous awards").

One of the cases *Richardson* relied upon, *Tierney*, was a medical malpractice case in which the plaintiff suffered "substantial" injuries and "unique" suffering after having a stroke and was expected to have a "particularly difficult time adjusting to his new disabilities." *Tierney*, 268 Ill. App. 3d at 1064, 645 N.E.2d at 294. The court refused to consider other jury verdicts, stating:

"With regard to defendants' arguments that the jury's verdict should be compared to other similar awards and thereby found to be excessive, this is simply not the law in Illinois. [Citations.] It is not within our purview to establish a new standard of review for such cases when the clear weight of Illinois authority has been to reject the 'comparison' concept." *Tierney*, 268 Ill. App. 3d at 1065, 645 N.E.2d at 294.

Defendants cite two other cases for the proposition that we should examine prior verdicts to establish a comparative range. However, the court's "comparison" in *Johnson v. May*, 223 Ill. App. 3d 477, 488, 585 N.E.2d 224, 231-32 (1992), was only a passing reference in support of the court's conclusion that judgment for the defendants was "contrary to the weight of the evidence." The court summarized extensive medical and psychiatric testimony which "overwhelmingly" supported plaintiff's acute-posttraumatic-stress-disorder claim (*Johnson*, 223 Ill. App. 3d at 485, 585 N.E.2d at 230) and discredited the defendant's only medical expert (*Johnson*, 223 Ill. App. 3d at 486, 585

N.E.2d at 230). The court also pointed out various problems with other evidence which purportedly showed the plaintiff was only faking injury. *Johnson*, 223 Ill. App. 3d at 487, 585 N.E.2d at 231. After engaging in this extensive factual analysis, the court also commented:

> "The reported case law shows that persons afflicted with posttraumatic stress disorder arising from accidents comparable in severity to [the plaintiff's] have received as much as a half a million dollars in noneconomic damages from the negligent party. While the magnitude of that award is scarcely controlling in other cases, we think that it is at least some indicia of just how far off the mark the jury's verdict [of $20,609.60 for noneconomic damages] was in this case." *Johnson*, 223 Ill. App. 3d at 488, 585 N.E.2d at 231.

We do not read *Johnson* to mean that a bare comparison of dollar figures is an appropriate basis for deeming an award excessive.

Defendants' other case, *House v. Stocker*, 34 Ill. App. 3d 740, 340 N.E.2d 563 (1975), is also only somewhat helpful. In that case, the plaintiff sustained relatively limited injuries to ligaments in his lower back and left knee which could be easily compared with the lower-back and related injuries sustained by other plaintiffs. In fact, the court rejected certain cases cited by the appellee, as too factually dissimilar, because none of them "solely involve[d] soft tissue contusions, spasms, sprains and abrasion with possible cartilage tear in a knee." *House*, 34 Ill. App. 3d at 746, 340 N.E.2d at 568. Based in part on its comparison with the injuries and verdicts disclosed in other cases, the court reduced the jury's award by about a third. In contrast to the limited injuries described in *House*, however, the Velardes and Apulellos sustained what are aptly characterized as "substantial" and "devastating" physical and psychological injuries and consequences that will be long term, if not permanent, even with medical intervention. The evidence established, for example, that Lilia suffers from organic brain damage, postconcussion syndrome, posttraumatic stress disorder, severe and permanent depression, and "ahedonia," which is the inability to experience pleasure. In her early 40s, she has been declared incompetent and is no longer capable of undertaking her former responsibilities, such as managing the family finances and working as an assembly line supervisor. Her long-term prospects are poor. Her husband Rafael, who is about the same age, used to have "a wife, [a] best friend and [a] lover," but no longer has "any of that" and interacts with Lilia as if she is a young child. Her father Fidel, who was found in the rear cargo area of the wrecked Ford Explorer, also suffers from permanent brain injury, resulting in depression and permanent memory problems, diminished attention span, decreased right side coordination, and an abnormal gait. Before the accident he

was a retired landscaper who maintained a well-manicured yard, but he now needs ongoing physical, occupational, and speech therapy, and requires supervision because he poses a risk to his own safety. Francisca's permanent brain injury is more severe than her husband's, and she also suffers from severe depression and posttraumatic stress disorder. Although in her early 70s, she worked about 50 hours a week on an assembly line and was considered an exceptional and dependable employee. She was unable to return to work after the accident. Accordingly, we decline to depart from "the clear weight of Illinois authority [which] reject[s] the 'comparison' concept." *Tierney*, 268 Ill. App. 3d at 1065, 645 N.E.2d at 294.

Defendants' additional contentions that the awards are so large they must have been the result of passion or prejudice on the part of the jury and they shock the judicial conscience are adequately supported with citation to *Richardson*. *Richardson*, 175 Ill. 2d at 112-14, 676 N.E.2d at 627-29. Nevertheless, defendants' contentions are not persuasive. Although the awards are substantial, we cannot say they are unsupported by the record on appeal. Furthermore, the figures were returned by a jury that heard all of defendants' evidence and arguments before adjourning for deliberations. The trial judge, who also heard all of defendants' evidence and arguments, was not persuaded by defendants' posttrial arguments that the awards were excessive. We also point out that there is no explanation as to why defendants chose the specific figures they suggest would be appropriately awarded to these plaintiffs. For instance, they contend Cook County juries generally return "awards in the mid-six figure range" on loss of consortium claims, yet they recommend that Rafael receive $2 million after remitittur. We decline to second-guess the jury and reduce the awards to figures that appear to have been randomly chosen by defendants.

■ Defendants' final contention is that despite defendants' failure to object, even in a sidebar, portions of the Apulellos' and Velardes' separate closing arguments were prejudicial to such an extent that a new trial is necessary. Defendants also remark upon some of the Apulellos' opening statements but have waived this contention by failing to support it with citation to any authority. *Avery v. State Farm Mutual Automobile Insurance Co.*, 321 Ill. App. 3d 269, 277, 746 N.E.2d 1242, 1250 (2001). The Apulellos and Velardes respond that there is no merit to this final argument.

The scope of closing arguments is within the trial judge's sound discretion, and an argument must be prejudicial before a reviewing court will reverse on this basis. *Lewis v. Cotton Belt Route-St. Louis Southwestern Ry. Co.*, 217 Ill. App. 3d 94, 110-11, 576 N.E.2d 918, 932

(1991). Further, attorneys are allowed broad latitude in drawing reasonable inferences and conclusions from the evidence (*Lewis*, 217 Ill. App. 3d at 111, 576 N.E.2d at 932), and an opponent's failure to object to allegedly prejudicial remarks during closing arguments generally waives the issue for review (*Simmons v. University of Chicago Hospitals & Clinics*, 162 Ill. 2d 1, 13, 642 N.E.2d 107, 113 (1994)).

A court of review should "strictly apply the waiver doctrine unless the prejudicial error involves flagrant misconduct or behavior so inflammatory that the jury verdict is a product of biased passion, rather than an impartial consideration of the evidence." *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 375-76, 553 N.E.2d 291, 297 (1990). If arguments were so egregious that they deprived a litigant of a fair trial and substantially impaired the integrity of the judicial process itself, they may be reviewed even though no objection was made. *Gillespie*, 135 Ill. 2d at 375-77, 553 N.E.2d at 297-98. This standard has been applied in cases involving "blatant mischaracterizations of fact, character assassination, or base appeals to emotion and prejudice." *Gillespie*, 135 Ill. 2d at 377, 553 N.E.2d at 298. A leading opinion on the standard is *Belfield v. Coop*, 8 Ill. 2d 293, 134 N.E.2d 249 (1956).

*Belfield* was a will contest involving allegations and evidence that only one of the various defendants exerted undue influence over the testator, yet the plaintiffs' attorneys referred to all of the defendants as "thieves," "usurpers," and "defrauders." *Belfield*, 8 Ill. 2d at 312, 134 N.E.2d at 259. The plaintiffs' attorneys also belittled one of the defense attorneys, Samuel Saxon, by repeatedly referring to him as "Sammy," and implied that he was a disreputable lawyer. *Belfield*, 8 Ill. 2d at 312, 134 N.E.2d at 259. At the same time, the plaintiffs' attorneys praised their own high ethics and conduct and injected the fact that one of them was a county judge from a neighboring county who had extensive experience with wills and was duty-bound to uphold wills, suggesting there was something wrong with the will at issue, otherwise the judge would not be in the circuit court representing the plaintiffs. *Belfield*, 8 Ill. 2d at 312, 134 N.E.2d at 259. On review, the court concluded that so much of this closing argument was prejudicial and unwarranted that the trial judge should have halted the proceedings, despite the lack of objection, to insure that the litigants received a fair trial. *Belfield*, 8 Ill. 2d at 312-13, 134 N.E.2d at 259.

The *Belfield* standard was also discussed in an appeal from a medical malpractice judgment, *Simmons*, 162 Ill. 2d at 12-13, 642 N.E.2d at 112, after the plaintiffs' attorney drew attention to the defendants' failure to call as witnesses other physicians and hospital employees who were on duty at the time of the alleged medical error. The

plaintiffs' attorney remarked at length about the hospital staff's failure to rally to the accused physician's defense, referred to their absence as the " 'most glaring evidence of [the physician's] negligence,' " and concluded, " 'When your own people won't stand behind you and testify in your behalf, then you know you're wrong.' " *Simmons*, 162 Ill. 2d at 11-12, 642 N.E.2d at 112. The court determined that the plaintiffs' closing arguments did not deny the defendants a fair trial or result in a deterioration of the judicial process, and it remarked upon the defendants' failure to raise an objection or seek a curative instruction, even through a sidebar. *Simmons*, 162 Ill. 2d at 12-13, 642 N.E.2d at 113. It stated, "Because defendants failed to do these things, the issue has been waived. Defendants should not benefit by their failure to object or request a sidebar and wait for a jury verdict, only to raise this issue in a post-trial motion and on appeal in hopes of a new trial." *Simmons*, 162 Ill. 2d at 13, 642 N.E.2d at 113.

We reach the same conclusions about the closing arguments which defendants now object to for the first time on appeal. The issue has been waived.

For instance, the jury was told that Lilia needed the supervision and guidance given to an eight- or nine-year-old, that her sister helped her use the washroom, bathe, and perform other hygiene, that Lilia could not return to her former occupation and was incapable of independently completing ordinary tasks such as doing the household laundry, that she preferred to use her hands instead of a fork at meal time, and that she no longer engaged in meaningful conversations with her sister. Defendants now object, however, that the following statement to the jury was a mischaracterization of the facts:

> "[THE APULELLOS' COUNSEL]: Disability. Is she disabled? Can she do anything? Go to the bathroom? Eat food? She can't talk to anybody. She doesn't have any kind of life. Can't work anymore. She can't enjoy life. \*\*\* She's not able to do anything without the assistance of others and she is a danger to herself. She needs somebody to watch her all the time. That's how disabled she is."

Contrary to defendants' assertion, we find these remarks were merely permissible inferences or conclusions based on the evidence about Lilia's disabilities.

The jury was also told that Lilia's ability to report earlier memories began deteriorating, that she was no longer fluent in two languages, her intellectual functioning was blunted, and she had difficulty writing and remembering words and made mistakes copying from one sheet of paper to another. The jury was also told that Lilia's long-term prospects are poor. Nevertheless, defendants now object that the Apulellos' counsel mischaracterized the facts by making state-

ments such as Lilia "will not get her brain back," she has a "broken brain, missing memories, [is] the shadow of a human being, a woman who, according to Dr. Fajardo is basically now heading for a vegetative state." We reject defendants' assessment of these remarks.

We are similarly unpersuaded that it was prejudicial for the Apulellos' counsel to say that because defendants "blame[ed] the driver" by eliciting testimony from accident witnesses who were not struck by the train, defendants' admission of responsibility was actually a "half truth." The "half truth" remark is an even milder characterization than the one made during the *Simmons* trial which did not warrant retrial: " 'When your own people won't stand behind you and testify in your behalf, then you know you're wrong.' " *Simmons*, 162 Ill. 2d at 12, 642 N.E.2d at 112. Defendants highlight other, even less significant characterizations, which do not warrant discussion.

Defendants also contend the Apulellos improperly appealed to the jury's emotions by referring to other family members during closing arguments. Defendants cite *LeMaster v. Chicago Rock Island & Pacific R.R. Co.*, 35 Ill. App. 3d 1001, 1014, 343 N.E.2d 65, 76 (1976), for the proposition that referring to nonparty family members during closing arguments is prejudicial. The jury in *LeMaster* was told the plaintiff had a wife and two young children, even though his action was limited to damages for work-related injuries and did not include a claim for family support or loss of consortium. *LeMaster*, 35 Ill. App. 3d at 1013-14, 343 N.E.2d at 76. The plaintiff testified that he was no longer able to go ice skating with his wife and young children, or go dancing with his wife, and that he needed her assistance to bathe, and then some of this testimony was emphasized during counsel's closing arguments. *LeMaster*, 35 Ill. App. 3d at 1013-14, 343 N.E.2d at 76. The trial judge overruled the defendant's objections to both the testimony and closing arguments, and was affirmed on appeal, because no undue emphasis was placed on the plaintiff's family circumstances and the facts were relevant to the issue of the extent of his injuries. *LeMaster*, 35 Ill. App. 3d at 1014, 343 N.E.2d at 77. Although the present defendants did not make an objection before the trial judge, they now take issue with a remark by the Apulellos' counsel that Lilia's sister, a nonparty, "would not get her sister back." We were unable to find this remark in the portion of the record cited by defendants, but did locate a similar reference, 64 pages earlier in the transcript of closing arguments. The Apulellos' counsel began closing arguments by stating, "Lil[ia] Apulello will not get her life back. Lil[ia] Apulello will not get her brain back. Her husband will not get his wife back. Her sister won't get her sister back." We point out that Lilia's sister was a prominent trial witness; thus, the jury was already well aware of her

existence and was not abruptly burdened with an irrelevant or prejudicial fact. Further, in context, the reference is clearly a permissible description of the extent and permanent nature of Lilia's injuries and disabilities, rather than a prejudicial plea for damages on her sister's behalf. Defendants contend that the following final words to the jury were impermissible references to non-party family members:

"[THE APULELLOS' COUNSEL]: You know, they're supposed to stop and protect this crossing. If they had stopped and protected it, of course, none of this would have happened, so what [Lilia] did or didn't do has nothing to do with what caused the accident. They set it all in motion. They did, the railroads.

The stop and protect that really is at issue today is that you have to stop; you have to protect; you have to protect this family."

In light of the fact that all of the plaintiffs were indisputably "family"—husband Fidel, wife Francisca, daughter Lilia, and son-in-law Rafael—we construe this concluding remark as a permissible, nonprejudicial reference to parties before the jury, rather than to nonparty family members.

Finally, defendants address two aspects of the Velardes' closing arguments. Although defendants did not object in the trial court, they now argue "The Velarde[s'] counsel compared plaintiffs' losses to property damage—a $50 million Monet—effectively forcing the jury to award more out of sheer guilt [citation]. The guilt trip was compounded by an incorrect statement that the law required a large award [citation]." The following portion of the proceedings is pertinent:

"[THE VELARDES' COUNSEL]: Now, if this were an easier case and we weren't dealing with these types of injuries and this was a case of property damage, and if that train had come barreling through that crossing at 50 miles per hour and had hit a truck and that truck was carrying a painting, a Monet painting, an impressionistic painting, and it destroyed it, and there was a lawsuit that was ensued and every expert in the world testified this was one of the great paintings in the world, this Mr. Monet, who's been deceased for a lot of years, who was truly one of the great painters, and every expert testified that that painting had a value of $50 million and one of the jurors went back and said, you know, I don't like impressionistic paintings, I just don't appreciate it, I can't award $50 million, I could maybe award $25 million. Well, that wouldn't be full justice. It wouldn't be fair justice. It would be half justice.

And wouldn't it be a shame in this case if this case were decided for any reason other than the law and the facts.

Let's not confuse the two cases, a property damage case and a case like this, a case applicable to catastrophic, devastating injuries

to Fidel and Francisca, which by necessity under the law have to be large.

I want to talk a little bit about the elements of damages the Judge is going to instruct you on \*\*\*."

We fail to comprehend defendants' argument regarding the analogy to a Monet painting. We do not see how referring to a skillful painter or expensive artwork could in any way cause jurors to feel "guilt" over injuries they had no hand in causing. Further, because none of the cited cases discuss a "guilt trip" standard, we construe defendants' argument as an assertion that the Monet analogy was, in some way, an appeal to emotion or prejudice. See *Gillespie*, 135 Ill. 2d at 377, 553 N.E.2d at 298. Nevertheless, we read the quoted remarks as indications that the jurors should rely on the "expert [witness] testi[mony]" regarding the "value" of plaintiffs' losses and award the "full" and "fair" amount justified by "the law and facts" of the case, regardless of whether the jurors "like[d]" or "appreciate[d]" the plaintiffs personally. Accordingly, we do not consider the Monet analogy to be inappropriate or prejudicial. Additionally, it is less than clear what the Velardes' counsel intended to convey by the sentence regarding "a case applicable to catastrophic damages to Fidel and Francisca, which by necessity under the law have to be large." The jumbled statement did not elicit an objection and is potentially only a mistranscription of what was actually said. Even if we construe it as an inaccurate suggestion that the jurors were required by law to return large verdicts for the Velardes, we do not consider it prejudicial. It was only a vague, passing remark, which was not clarified or emphasized by subsequent argument. Furthermore, defendants participated in a jury instruction conference and are not contending that the trial judge followed the closing arguments with erroneous instructions about the applicable law. In addition, before the Velardes' counsel began closing arguments, the trial judge cautioned the jurors, twice, to remember that the attorneys' final arguments were "merely what they think the evidence has shown." In light of all these facts, we reject defendants' assertion that the Velardes' remark about damages warrants a new trial.

We conclude that the Apulellos' and Velardes' closing arguments did not deny defendants a fair trial or result in a deterioration of the judicial process. We also note that trial counsel, who heard the remarks firsthand and was able to observe their impact on the jurors, did not

consider them worthy of contemporaneous objection, even through a sidebar, or necessitating a curative instruction.

Affirmed; plaintiffs' motion taken with the case not considered.

GORDON and McNULTY, JJ., concur.