NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190303-U

NO. 3-19-0303

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| JOSEPH LIGHTFOOT, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Kankakee County |
| KANKAKEE COMMUNITY COLLEGE, KANKAKEE | ) | No. 13L159 |
| COMMUNITY COLLEGE BOARD OF TRUSTEES, | ) | |
| JOHN AVENDANO, JULIA WASKOSKY, DAVID | ) | |
| CAGLE, TED PETERSEN, MARY E. KILBRIDE, a/k/a | ) | |
| MARY E. SAIS, KANKAKEE HIGH SCHOOL and | ) | |
| KANKAKEE SCHOOL DISTRICT NO. 111, Defendants, | ) | |
| (Kankakee Community College Board of Trustees, John | ) | Honorable |
| Avendano, Julia Waskosky, and David Cagle, Defendants- | ) | Adrienne W. Albrecht, |
| Appellees). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Cavanagh and Holder White concurred in the judgment.

**ORDER**

¶ 1  *Held:*  The trial court did not err in denying plaintiff's motion for judgment *n.o.v.* and motion for a new trial.

¶ 2  In December 2013, plaintiff, Joseph Lightfoot, filed this lawsuit against Kankakee Community College (KCC), KCC's Board of Trustees (Board), John Avendano, Julia Waskosky, David Cagle, Ted Petersen, Mary E. Kilbride, also known as Mary E. Sais, Kankakee High School, and Kankakee School District 111. In October 2014, plaintiff filed an amended complaint against KCC, the Board, Avendano, Waskosky, and Cagle. Plaintiff, who was the first African-American head coach of the men's basketball team at KCC, alleged he was subjected to intentional discrimination on the basis of his race while working at KCC. He also alleged his

employment at KCC was terminated because he refused to make race-based recruiting decisions and made complaints about discrimination in the KCC Athletic Department.

¶ 3        In November 2018, a jury found in favor of defendants on all counts. In May 2019, the trial court denied plaintiff's motions for judgment *n.o.v.* or a new trial. Plaintiff appeals, arguing the trial court erred in denying both motions. The retaliation claims plaintiff brought against defendants pursuant to federal law (42 U.S.C. § 1981 (2012); 42 U.S.C. § 2000e-3(a) (2012)) are the focus of his appeal. We affirm.

¶ 4                                  I. BACKGROUND

¶ 5                            A. Plaintiff's Case-in-Chief

¶ 6        Plaintiff testified he was the assistant men's basketball coach for 12 years before being promoted to head coach in 2006. KCC's basketball program was successful during plaintiff's tenure. Plaintiff's issues at KCC began soon after his promotion. In the spring of 2006, another KCC employee filed a complaint alleging plaintiff was stalking or harassing her. The other employee found plaintiff hiding in a closet across from her office on the third floor of KCC's building. Plaintiff claimed he was hiding in the closet so he could secretly monitor whether his players were attending classes. He was not disciplined for this conduct but was barred from being on the third floor without an escort. Plaintiff complained about being restricted from the third floor to Dave Cagle, KCC's Director of Human Resources, and Dean Julia Waskosky, arguing he was being portrayed as a brutish, sex-craved, out-of-control black man.

¶ 7        In 2010, KCC decided to reduce its funding of the men's basketball program from the Division I level to the Division II level. Other witnesses later testified this was the result of a decision by KCC to fund all its sports programs at the Division II level. As a result of the

funding switch, the scholarships student athletes on the men's basketball team received would no longer include room and board.

¶ 8           Plaintiff asked Ted Petersen, KCC's Athletic Director, why the funding change was only happening after he became the head coach for the men's team. Petersen replied Title IX (20 U.S.C. §§ 1681 to 1688 (2006)) required equal funding for men's and women's sports, and the men's basketball program received more funding than all the other KCC athletic programs. Plaintiff told Petersen he thought the decrease in funding was racially motivated because the basketball team was predominately African-American and no other program was losing funding.

¶ 9           When plaintiff was head coach at KCC, KCC Trustee Dick Frey talked to him about recruiting a local white player. In addition, according to plaintiff, early in his tenure as head coach, the president of KCC at the time, identified as Dr. Weber, with whom plaintiff testified he got along with well, spoke candidly with plaintiff about pressure Weber was receiving from the Board of Trustees. This pressure was presumed to be caused by the fact plaintiff's entire team and coaching staff was African-American. Weber asked plaintiff if he had any white friends who plaintiff could bring in to help as an assistant coach. Weber also asked him if he could find any white players, even if they were not very good, to be on the team.

¶ 10          In October 2010, plaintiff was involved in an incident with one of his players, Jordan Agamy. Agamy had been on the team for a year and a half. Plaintiff testified he had a good relationship with Agamy. As a returning sophomore, Agamy was expected to set a good example for incoming freshmen and transfer students. According to plaintiff, at the practice where the incident occurred, Agamy had a negative attitude when plaintiff tried to correct a mistake Agamy made. Plaintiff threw a ball at Agamy. While the ball was in the air, Agamy

disrespectfully turned and started walking away and the ball hit him. Plaintiff then grabbed Agamy's jersey with both of his hands and said, "[D]on't you ever walk away from me, son, while I'm trying to help you. Boy, you know I'll hurt you." Plaintiff claimed he just meant to get Agamy's attention. He did not mean to physically threaten him. Plaintiff also told Agamy he would "plaster" his head with the basketball.

¶ 11 An investigation of this incident occurred in the fall of 2010. Plaintiff was suspended without pay and was required to write an apology letter to Agamy. He told his team he should have handled the situation better and went too far. After the investigation, plaintiff complained to Cagle, Petersen, and Dr. John Avendano, KCC's President, that he believed he was being discriminated against. He told Petersen he believed his punishment was unwarranted, and he was being made to look like a "[b]rute."

¶ 12 When meeting with Avendano around this same time, plaintiff told Avendano about his efforts to arrange for food and housing for his players because of the funding cuts for the basketball program. Plaintiff told Avendano he believed the funding cuts were racially motivated. He also told Avendano about the behavior of the head coach of the women's basketball team, Coach Donnie Denson, who was white, which included Denson making racial comments to plaintiff's players and Denson's own players. Avendano told plaintiff he would be consistent in his treatment of plaintiff and Denson.

¶ 13 On June 6, 2011, plaintiff met with Dr. Avendano to discuss his concerns about funding for the basketball program. Waskosky and Petersen were also at the meeting. Plaintiff told Avendano the team had a great season, but the year was extremely stressful for plaintiff because he was doing extra things to keep the program going because of the funding cut. Plaintiff testified Avendano's demeanor changed when Avendano asked plaintiff about an email

- 4 -

plaintiff had sent to an outside party requesting funding for the basketball team.

¶ 14     Plaintiff's testimony regarding the contents of this email and the conversation between plaintiff and Avendano regarding this email is not clear. Avendano had a printed copy of the email. In the email, plaintiff accused KCC of discriminatory conduct because the basketball team's 12 full-ride scholarships had been eliminated. Plaintiff solicited financial support for the basketball program in the email. Plaintiff admitted sending the email. Avendano accused plaintiff of lying in the email, but it is not clear about what. Plaintiff responded he did not lie because the funding had been pulled for his 12 full-time scholarships. At that point, Avendano's anger increased. He leaned forward, pointed at plaintiff, and threatened to fire him. Plaintiff was then dismissed from the meeting.

¶ 15     In the summer of 2011, plaintiff received a negative performance evaluation. This was his first evaluation after the Jordan Agamy incident. The evaluation encouraged plaintiff to recruit local athletes when possible. Plaintiff interpreted this to mean recruit white athletes who were good enough to play and contribute to the basketball team. The evaluation also noted plaintiff needed to respect the decisions and actions of the administration, especially when they applied to all staff. The evaluation used plaintiff's complaint his team's funding cut was racially motivated as an example of him not respecting administration decisions. Plaintiff was placed on six-months' probation. He received a positive evaluation in January 2012.

¶ 16     Plaintiff's next evaluation was dated May 2012 and recommended plaintiff's contract not be renewed. The evaluation discussed a situation involving another of plaintiff's basketball players, Brandon Ware, who had been dismissed from team housing because he and his girlfriend, Deliria Jones, became disruptive to the other players on the team. According to plaintiff, the final straw was when Jones kicked out a window trying to get to Ware. Plaintiff

testified he kept Petersen informed as to what was going on beginning somewhere between the middle of September and the middle of October 2011. Plaintiff told Petersen about Ware being kicked out of team housing in a face-to-face meeting. Ware was eventually kicked off the team after he cursed at plaintiff and missed a week of classes, 4 games, and 15 practices. His scholarship was later withdrawn.

¶ 17 The evaluation also mentioned plaintiff called Coach Denson a "rat" because he told on athletes who had been at a drinking party. The evaluation also noted plaintiff said a "rat" can lose his life in the black community. Coach Denson said he felt threatened by the comment because plaintiff had made other overt threats toward him in the past. Plaintiff testified the topic of "a rat" did come up in a meeting in the fall semester of 2011 attended by all six head coaches, Petersen, and Waskosky. His comment was not meant as a threat toward Coach Denson.

¶ 18 Plaintiff testified he, Petersen, and Cagle met in May 2012 to discuss plaintiff's evaluation. Cagle told plaintiff he could appeal the decision to Dr. Avendano. Petersen also told plaintiff he would not have a problem working with plaintiff if Avendano did not follow Petersen's recommendation to not renew plaintiff's contract. Plaintiff asked Petersen to change his recommendation so they could skip the appeal process. According to plaintiff, Petersen dropped his head and shrugged his shoulders. Cagle then asked Petersen whether he was going to stand by his recommendation, and Petersen said yes. Plaintiff was asked to turn in his keys and was escorted off the campus even though his contract did not end until June 30. Other employees whose contracts were not renewed had been allowed to finish out their contracts on campus.

¶ 19 After meeting with Petersen and Cagle, plaintiff wrote Avendano on May 29, 2012, and went to a meeting of the KCC Board to ask for his contract to be renewed. Individuals

from the African-American community, including two pastors and the president of the local chapter of the NAACP, spoke on his behalf. Some of these individuals made comments about racial discrimination. The Board's final decision was to not renew plaintiff's contract.

¶ 20 Defense counsel questioned plaintiff about an incident in 2004 where plaintiff had a female KCC student come to his house to pick up a book and answered the door wearing shorts and a robe. He was reprimanded for his behavior and told not to have other students at his house, to abide by KCC's sexual harassment policy, and to have no further contact with the student. Plaintiff testified he did not believe he did anything wrong because he knew the student.

¶ 21 With regard to the Jordan Agamy incident, plaintiff testified he was given a three-day suspension, had to write an apology letter, and was required to undergo anger management classes or counseling. He did not complete the anger management counseling. Plaintiff stated he told Cagle he and the counselor were having difficulty meeting. Cagle told him not to worry about it and move forward. He was also told he could not engage in threatening, aggressive, violent, or any other inappropriate or unprofessional behavior or he could be terminated. After the Agamy incident, plaintiff was required to keep Petersen informed of plaintiff's decisions before he acted on those decisions.

¶ 22 President Avendano testified he started at KCC in July 2009. In 2012, he recommended the Board not renew plaintiff's contract. Between 2009 and 2012, plaintiff occasionally made comments suggesting he believed he was being discriminated against by people at KCC. Around the time of the Jordan Agamy situation, plaintiff told Avendano he felt like he had to tread lightly on campus and complained the reduction in scholarship funding was not fair to plaintiff. Avendano stated his recommendation not to renew plaintiff's contract in May 2012 was based in part on the Jordan Agamy incident. He also took Petersen's

recommendation and plaintiff's 2011 and 2012 evaluations into consideration.

¶ 23    Avendano was also questioned about the Board's meeting when plaintiff's contract was not renewed. During the open session, plaintiff's supporters brought race into the conversation. Most of the crowd was African-American and part of plaintiff's church congregation. Avendano admitted he stated the meeting was like a "zoo." However, he explained the Board normally has no one attend its meetings and this meeting had a hostile, standing room only crowd. A few of the trustees said they felt offended or threatened by comments made by a pastor who spoke in support of plaintiff at the meeting.

¶ 24    Julia Waskosky testified she became the Dean of Student Development and Services at KCC on February 14, 2011, and oversaw the operation of KCC's Athletic Department. She supervised Petersen and reported to Dr. Avendano. Generally speaking, KCC expected its coaches to recruit the best players it could get but were also expected to recruit local players. At some point in 2011 or 2012, she recommended plaintiff's contract not be renewed to Avendano. Petersen recommended the same thing. She believed plaintiff would have another incident, and when it happened, she believed she would have a hard time justifying why she did not do anything sooner.

¶ 25    Ted Petersen testified he was KCC's Athletic Director from the fall of 2008 until December 2015. Petersen testified the head coaches at KCC usually had an additional major administrative duty. Plaintiff served as an academic adviser until he received the negative performance evaluation in 2011. He was then assigned the role of athletic tutoring coordinator. Petersen testified plaintiff built an outstanding men's basketball program from 2008 through 2012. KCC expected its coaches to recruit the best players they could get, and plaintiff recruited very good players from outside KCC's district. In 2009, Petersen gave plaintiff a positive

evaluation, noting the respect his players had for him and plaintiff's effort to build the character of his players off the court.

¶ 26 Plaintiff complained to Petersen several times he believed he was being discriminated against at KCC. Petersen reported plaintiff's complaints to Waskosky. He also reported some of plaintiff's complaints to Avendano. Petersen testified plaintiff's complaints bothered him because he did not want members of his staff to feel discriminated against. However, he also stated the complaints bothered him because the comments reflected plaintiff's negative attitude. In plaintiff's July 2011 evaluation, Petersen wrote plaintiff needed to improve his attitude with regard to the administration's decision to fund all of KCC's athletic teams at the Division II level. Petersen also wrote plaintiff needed to respect the administration's decisions and actions, especially when the decisions and actions applied to all KCC staff.

¶ 27 In May 2012, Petersen believed plaintiff was prone to explosive anger and his players were at risk for being physically assaulted. Based on his observations of plaintiff between 2008 and 2012, Petersen recommended plaintiff's contract not be renewed. Neither Waskosky, Cagle, nor Avendano opposed his recommendation. Ultimately, the Board accepted his recommendation. Petersen stated his recommendation was based on plaintiff's anger issues and poor judgment and had nothing to do with plaintiff's other issues. Petersen testified he observed plaintiff's anger during meetings and in written communications. Petersen acknowledged Coach Denson also had anger issues and used profanity. However, Denson never physically threatened or assaulted his players.

¶ 28 B. Defendant's Case-in-Chief

¶ 29 Petersen testified plaintiff, after the incident with Agamy, was given a written warning, suspended for three days without pay, required to attend anger management counseling

with KCC's employee assistance provider, and apologize in writing to Agamy for his inappropriate and unprofessional actions, comments, and behavior. Plaintiff was found to be in violation of KCC's violence-free workplace policy and was told any future episode of violence, aggression, threats, or other inappropriate and unprofessional behavior would result in further disciplinary action, possibly including termination of his employment. Plaintiff was told he needed to keep Petersen informed of plaintiff's decisions before he acted on those decisions (the scope of this directive is not clear from the record), engage in no volatile behavior, act professionally at all times, perform all his new duties, and favorably represent the college at all times. Plaintiff was to be reevaluated within six months.

¶ 30      Between July 2011 and January 2012, Petersen believed plaintiff complied with the performance improvement plan and had no issues with plaintiff's performance. In January 2012, Petersen recommended plaintiff's employment be continued based on what he knew at the time. However, plaintiff's corrective action plan remained in place. After the January 2012 evaluation, Petersen learned about the incident involving Brandon Ware's girlfriend kicking out a window where the basketball team lived.

¶ 31      Petersen found plaintiff had other troubling incidents starting in 2007 when he grabbed another basketball player by the neck over a housing issue. Plaintiff denied this happened. Plaintiff also had an incident at Highland Community College where he threw a chair out on the court, received a technical foul, and went after an official at the end of the game. A security guard had to intervene in the situation. Plaintiff started yelling, "Can't a black man get angry without security being called?" Petersen testified he saw a pattern where plaintiff would become very angry and physically aggressive, particularly if he believed he was being disrespected.

¶ 32 With regard to the May 2012 meeting between himself, plaintiff, and David Cagle where Peterson told plaintiff he was not recommending plaintiff's contract be renewed, Petersen testified the meeting lasted about three and a half hours. Petersen said it was his decision to recommend plaintiff's contract not be renewed and no one pressured or forced him to make this recommendation. Petersen testified his decision to recommend plaintiff's contract not be renewed was not based on a single incident but a plethora of things. Plaintiff knew within the first five minutes of the meeting Petersen would recommend plaintiff's contract not be renewed. Plaintiff spent the rest of the meeting trying to change Petersen's mind. Although plaintiff was wearing him out after three and a half hours, plaintiff was not going to change Petersen's mind.

¶ 33 Petersen testified plaintiff blamed racism whenever he met any resistance or things did not go the way he thought they should. While Coach Denson also had anger issues and was also sent to anger management counseling, Denson completed anger management counseling, unlike plaintiff.

¶ 34 Julia Waskosky testified she did not play a role in the Jordan Agamy investigation and denied telling Petersen what his recommendation should be with regard to plaintiff's contract. Waskosky agreed with Petersen's recommendation not to renew plaintiff's contract. She offered to resign her position if plaintiff's contract was renewed because she could not support plaintiff's pattern of behavior which it was her responsibility to oversee. She denied the decision not to renew plaintiff's contract was based on his race. She also denied being pressured by anyone to recommend plaintiff's contract not be renewed.

¶ 35 David Cagle testified he did not tell plaintiff he did not have to complete anger management counseling. According to Cagle, the personnel handbook states employees who engage in violent or aggressive behavior are subject to disciplinary action up to and including

termination.

¶ 36      John Avendano testified he did not have the power to hire and fire employees at KCC. The Board had that power. Avendano stated Jordan Agamy filed a claim against KCC after the incident between plaintiff and Agamy. KCC paid money to Agamy as a result. Avendano testified the decision to cut funding to the men's basketball program was not a race-based decision. The decision was made because KCC was spending significantly more money on the men's basketball team than any other team.

¶ 37      Avendano, like Petersen and Waskosky, testified plaintiff was not required to recruit locally and recruiting locally did not mean recruiting white athletes. He believed students from families in the district should have the opportunity to participate in extracurricular activities, athletics, and academics on campus. He also explained KCC received no state funding for student athletes who were not Illinois residents.

¶ 38      According to Avendano, he offered no instructions to either Petersen or Waskosky with regard to what they should recommend concerning plaintiff's contract. He also stated his recommendation to the Board not to renew plaintiff's contract was not based on plaintiff's race. According to Avendano, plaintiff's situation had reached the point where Avendano wondered what he would tell the next parent who had complaints about plaintiff's inappropriate behavior with his or her son or daughter. Plaintiff's behavior had not changed, and Avendano did not think it would change.

¶ 39      The jury found for defendants on all counts.

¶ 40      On December 10, 2018, plaintiff filed a motion for judgment *n.o.v.* or a new trial. Plaintiff focused on his retaliation claims. After a hearing in May 2019, the trial court denied plaintiff's motion.

¶ 41    This appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43    Plaintiff's appeal centers on his claims his contract at KCC was not renewed because defendants retaliated against him for making statements opposing racial discrimination. Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.* (2012)) prohibits an employer from retaliating against an employee because the employee opposed an employee practice made unlawful by Title VII or because he made a charge, assisted, testified, or participated in any manner in an investigation, hearing, or proceeding under Title VII. *Brown v. Advocate South Suburban Hospital*, 700 F.3d 1101, 1106 (7th Cir. 2012).

¶ 44    The United States Supreme Court has addressed the burden of proof in retaliation cases, stating, "Title VII retaliation claims must be proved according to traditional principles of but-for causation ***[, which] requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful actions or actions of the employer." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013). The trial court in this case gave the jury the following instruction:

> "Plaintiff claims that his employment was terminated by Defendants because he complained about discrimination. To succeed on this claim, Plaintiff must prove by a preponderance of the evidence that Defendants terminated his employment because of his complaints. To determine that Plaintiff's employment was terminated because of his complaints, you must decide that Defendants would not have terminated Plaintiff's employment if he had not complained about discrimination but everything else had been the same. If you find that Plaintiff has proved this by a preponderance of the evidence, then you must find for the

Plaintiff. However, if you find that the Plaintiff did not prove this by a preponderance of the evidence then you must find for the Defendants."

The jury in this case obviously found plaintiff did not prove by a preponderance of the evidence his contract would have been renewed if he had not made complaints about racial discrimination. After the jury found for defendants on all counts, the trial court denied plaintiff's motion for judgment *n.o.v.* and motion for a new trial.

¶ 45                                A. Judgment *N.O.V.*

¶ 46         Our supreme court has noted different standards exist for granting a motion for judgment *n.o.v.*—also known as a judgment notwithstanding the verdict—as opposed to granting a motion for a new trial because of the different results when these motions are granted. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 509-10, 229 N.E.2d 504, 513 (1967). A party who requests a judgment *n.o.v.* is asking the trial court to reverse a decision reached by the trier of fact. A court should only grant a motion for judgment *n.o.v.* if all of the evidence, when viewed in a light most favorable to the non-moving party, is so overwhelmingly in favor of the moving party that no contrary verdict based on the evidence could ever stand. *Pedrick*, 37 Ill. 2d at 510, 229 N.E.2d at 513-14.

¶ 47         This is a very difficult standard for the moving party to meet, and a trial court should grant a motion for judgment notwithstanding the verdict only in extreme situations. *Velarde v. Illinois Central R.R. Co.*, 354 Ill. App. 3d 523, 537, 820 N.E.2d 37, 52 (2004). "The [trial] court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508,

512 (1992).

¶ 48 When reviewing the denial of a motion for judgment *n.o.v.*, we apply a *de novo* standard of review. *McClure v. Owens Corning Fiberglass Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999). However, we apply the same analysis as the trial court. It is neither the role of the trial court nor this court to "usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple*, 151 Ill. 2d at 452-53, 603 N.E.2d at 512. In other words, this court is not to reweigh the evidence or make credibility determinations. *Maple*, 151 Ill. 2d at 452-53, 603 N.E.2d at 511-12.

¶ 49 After viewing the evidence in this case in a light most favorable to defendants, the trial court did not err in denying plaintiff's motion for judgment *n.o.v.* because the evidence does not overwhelmingly establish plaintiff's contract would have been renewed if he had not complained about racial discrimination. The jury heard evidence defendant had a pattern of anger management problems. This included evidence defendant had choked one of his players. Plaintiff denied this happened. However, the jury was in the best position to determine plaintiff's credibility. Plaintiff had also hit another player, Jordan Agamy, with a basketball, grabbed Agamy by the jersey with both hands, threatened to physically harm Agamy, and plaster a basketball on his head. Plaintiff's aggressive behavior was directed at more than just his players. He had an incident at a basketball game where he became so angry at a referee that after the game a security guard had to intervene.

¶ 50 Further, the jury heard testimony plaintiff was given the opportunity to change his behavior. KCC did not immediately terminate plaintiff as a result of the incident with Agamy. However, he was directed to complete anger management counseling and comply with any

directives given as part of the program. Plaintiff failed to complete his counseling.

¶ 51 Dr. Avendano testified he did not believe defendant was going to change. Further, Athletic Director Petersen, plaintiff's immediate supervisor, testified he saw a pattern where plaintiff would become very angry and physically aggressive, particularly if he believed he was being disrespected. In addition, both Dr. Avendano and Dean Waskosky testified they wondered how they would explain why plaintiff was allowed to continue to work at KCC if he harmed someone else.

¶ 52 Plaintiff argues his July 2011 performance evaluation and a May 30, 2012, email from Petersen to Avendano explaining Petersen's recommendation not to renew plaintiff's contract clearly establishes plaintiff was terminated because of his complaints about discrimination and not his job performance or his anger issues. We disagree. While these documents reference the fact plaintiff needed to, but would not, accept KCC's decision to reduce the level of funding for the men's basketball program to the Division II level like all other sports at KCC, which plaintiff complained was a racially motivated decision, the evaluation and email also covered other troubling issues concerning plaintiff. Plaintiff only focuses on the parts of these documents he believes help his case and ignores the information outlining his behavioral issues at KCC.

¶ 53 Plaintiff also argues circumstantial evidence clearly established he was terminated in retaliation for complaints he made about racial discrimination. For example, he argues the fact Coach Donnie Denson was not also fired shows defendants retaliated against plaintiff because of his complaints of racial discrimination. While plaintiff presented evidence Denson had anger issues and verbally abused his players, the jury heard testimony Denson had never physically assaulted or threatened any of his players with physical harm. Denson also completed

- 16 -

anger management counseling. As a result, the fact Denson was not fired did not clearly establish defendants were retaliating against plaintiff.

¶ 54 Plaintiff additionally argues defendants exhibited extreme hostility toward him after he made his complaints of racial discrimination and started investigating ways to terminate his employment. Plaintiff's brief relies on his own testimony regarding statements allegedly made by Dr. Avendano in October 2010, instructing defendant not to complain to the black community, and in June 2011, threatening to fire plaintiff because he said the decision to reduce the basketball team's funding was racially motivated. Plaintiff's brief does not identify in the record where Avendano admitted making these statements, and the jury did not have to believe these statements were ever made. Further, even if the jury believed Avendano made the comments, the jury still could have determined plaintiff would have been fired even if he had not complained about racial discrimination.

¶ 55 Plaintiff further argues defendants started compiling negative information about him in the fall of 2011 and spring of 2012—after he complained about racial discrimination—to later use against him during the contract renewal process. However, as defendants point out, plaintiff was actually given a positive performance review in January 2012 after he made the racial discrimination complaints. The jury could have viewed this evaluation as evidence defendants were not retaliating against defendant for his complaints regarding racial discrimination.

¶ 56                                B. Motion for a New Trial

¶ 57 As for plaintiff's motion for a new trial, a trial court should set aside a verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512. Our supreme court has stated a verdict is against the manifest

weight of the evidence where the jury's findings are unreasonable, arbitrary, and not based upon the evidence or the opposite conclusion is clearly evident. *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512-13. A trial court's decision to deny a motion for a new trial will not be disturbed unless "it is affirmatively shown that [the trial court] clearly abused its discretion." *Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513. "In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial." *Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513.

¶ 58        Plaintiff argues the trial court abused its discretion in denying his motion for a new trial. According to plaintiff, the trial court's reasoning was flawed, and the evidence weighed heavily in favor of a finding of retaliation. Even assuming, *arguendo*, the trial court's reasoning was flawed, we disagree with plaintiff's assertion the evidence weighed heavily in favor of a finding of retaliation for the reasons already noted. Even if we applied a *de novo* standard of review instead of determining whether the trial court abused its discretion, the jury's verdict on plaintiff's retaliation claims was not unreasonable or arbitrary and the opposite conclusion is not clearly evident based on the evidence.

¶ 59                                III. CONCLUSION

¶ 60        For the reasons stated, we affirm the trial court's judgment.

¶ 61        Affirmed.